Alabama Agricultural and Mechanical University ("A M"); its president, Dr. John Gibson; and 11 members of its board of trustees (hereinafter referred to collectively as "the University") appeal from a declaratory judgment in favor of Dr. Jeanette Jones, a tenured professor of biology at A M, awarding her approximately $44,000 in her action seeking back pay and injunctive relief, based on an alleged oral contract with the University. We reverse and remand.
 I. Background
The events underlying this dispute began early in the 1994-95 academic year, while Dr. Jones was the vice president for research and development for A M. At that time, Dr. David Henson, who was then president of A M, allegedly made an oral promise to Dr. Jones to increase her salary by approximately $10,000. More specifically, "her salary [was to] be raised in two steps — one step that academic year (1994-95), and the second step the following year (1995-96) — ending up with a salary of approximately $90,000 per year." Dr. Jones's brief, at 4-5.
In September 1994, Dr. Henson initiated the first step by submitting a directive to the vice president for business and finance, who, in turn, passed the directive to the director of the department of human resources and personnel. Thus, Dr. Jones received the first step of her raise, which was evidenced by a "Personnel Action Form," signed by Dr. Henson on September 16, 1994, effective from October 1, 1994, to September 30, 1995. However, Dr. Henson resigned as president of the University in August 1995, and, by a letter dated September 5, 1996, his successor, Dr. Gibson, notified Dr. Jones that her "employment as Vice President for Research and Development" would terminate on September 30, 1996, although she continued to be employed as a biology professor. Dr. Jones never received the second step of the salary increase.
On June 8, 1998, Dr. Jones filed a grievance with the grievance committee for A M ("the committee"). The committee recommended that Dr. Jones receive "payment *Page 870 
of the 1995 adjustment if it [should be] found that the [board of trustees] approved consecutive year payments," because she had "served as Vice-President during a second year." Subsequently, Joe Boyer, the Interim Provost/Academic Vice President, wrote Dr. Gibson a letter, stating, in pertinent part:
 "A hearing has been held on the allegations of Dr. Jones that the University has acted inappropriately insofar as she is concerned. She alleged that (1) it was inappropriate to have removed her as Vice President for Research and Development. The [committee] did not address this issue. It did, however, recommend that Dr. Jones be paid a sum of money that she claims is owed to her. The claim is based upon an unsubstantiated claim that the former President of [A M] promised a salary adjustment to all vice presidents. Since the first installment on the adjustment was paid, she claims that she is due the remainder of the adjustment. Had Dr. Jones remained in the position, she would have a claim to the adjustment since, in my view, the adjustment was for the position of Vice President, not the holder of the position. I would not therefore accept the recommendation of [the committee] on this claim."
(Emphasis added.) Dr. Gibson concurred with Boyer's recommendation, and declined Dr. Jones's request for the salary increase.
On June 14, 2000, Dr. Jones sued A M, as well as Dr. Gibson and the 11 trustees in their official capacities. Her complaint, as last amended, contained a breach-of-contract claim, alleging that the University had adopted a salary schedule that "form[ed] a part of Jones's employment contract with the [University]," and that the University had breached the contract "by wrongfully failing to award Jones the second half of the salary increase." She sought "specific performance and/or injunctive relief . . ., including but not limited to orders directing [the University] to increase [her] salary in accordance with the second half of the salary increase, and reimburse Jones for failure to award the salary increase in the past, and/or to award back pay." (Emphasis added.) Dr. Jones's complaint also sought a judgment declaring that she was "entitled to an increase in her salary in accordance with the salary increase," and to "an award of backpay for failure of [the University] to award the salary increase." (Emphasis added.) Finally, her complaint sought a writ of mandamus, directing the University to "increase her salary in accordance with the salary increase," and to "award back pay." (Emphasis added.)
The University answered the complaint, asserting affirmative defenses, including sovereign immunity and the Statute of Frauds. The University later moved for a summary judgment. The trial court denied the motion, but with the notation: "No monetary damages can be awarded as to the contract count."
The case was tried without a jury. The trial court determined that the University was "required to increase [Dr. Jones's] annual salary by an amount of $4,955.00 annually, beginning with the 1998-99 academic year." Notwithstanding its previous conclusion that no damages could be awarded for breach of contract, the court awarded Dr. Jones back pay. More specifically, it ordered the University to "pay to [Dr. Jones] an amount equal to the compensation she would have received from the beginning of the 1998-99 academic year until the date of [its] order if [she] had received a raise of $4,995.00 for the 1998-99 academic year, and continuing to the [date of the order]." The award was to be augmented by "all cost of living *Page 871 
increases provided to [A M] employees," plus prejudgment interest. The trial court also ordered the University "to immediately raise [Dr. Jones's] annual compensation in the amount of $4,995.00, plus any cost of living increase from 1998." Thus, the trial court ordered both retrospective and prospective relief. The University appealed.
Although the University raises a number of issues on appeal, two of those issues are dispositive. The first issue is whethersovereign immunity, as expressed in Ala. Const. 1901, § 14, bars either the retrospective or prospective relief ordered by the trial court. The second issue is whether the Statute ofFrauds bars either retrospective or prospective relief. We would ordinarily address sovereign immunity as a threshold issue. However, because of the peculiar interplay of the two defenses in this case, we will first address the Statute of Frauds defense.
 II. Statute of Frauds
Although it is apparently not seriously disputed that some
promise was made to Dr. Jones regarding a two-step raise, the University does dispute the terms of such a promise and argues that the promise violates Ala. Code 1975, § 8-9-2(1). That provision renders void "[e]very agreement which, by its terms, is not to be performed within one year from the making thereof," unless it, "or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith." Even if the University admitted the existence of an oral agreement, "such an admission would not prevent the Statute of Frauds from voiding the contract if the contract meets the criteria of the statute." Ex parte Ramsay, 829 So.2d 146,154 (Ala. 2002).
Dr. Jones's response to the University's argument is that the Statute of Frauds does not apply to this contract, either (1) because it could have been performed within one year, or (2) because the contract is no longer executory, that is, that Dr. Jones has fully performed. We address each of these arguments in turn.
 A. The One-Year Provision
"The one-year provision of the Statute of Frauds applies to any agreement which by its terms cannot be performed within oneyear." Abbott v. Hurst, 643 So.2d 589, 592 (Ala. 1994) (emphasis added). Dr. Jones argues that the promise was capable
of performance in one year, and, therefore, that the Statute of Frauds does not apply. However, this argument is belied by her own characterization of the promise. Specifically, she states: "In a one-on-one meeting, President Henson indicated that [Dr. Jones's] salary would be raised in two steps — one step that academic year (1994-95), and the second step the following year (1995-96) — ending up with a salary of approximately $90,000 per year." Dr. Jones's brief, at 4-5. Elsewhere, she says: "The first half of that pay raise would be paid during the 1994-95 school year; and, the second half would be paid during the 1995-96 school year." Dr. Jones's brief, at 5-6. In other words, according to Dr. Jones, she was to receive one step in thefirst year, and the second step a year later. This oral promise is a quintessential example of one to which § 8-9-2(1)is applicable. On its face, the promise of the second step of the raise was incapable of performance within one year of the making of the promise. Dr. Jones would not, indeed could not, receive any part of the second-step salary increase until she had been paid for one year under the first step. Thus, unless Dr. Jones can demonstrate that the oral promise falls within anexception to the Statute of Frauds, she cannot recover from the University. *Page 872 
 B. Executed or Executory
Dr. Jones invokes the executed-contract exception to the Statute of Frauds. Specifically, she states that the "`Statute of Frauds voids only executory contracts, not executed contracts.
. . . A contract is executed, and not voided by the Statute of Frauds, if the plaintiff has fully performed his obligation to the defendant and sues the defendant to obtain the defendant's performance or the completion of the defendant's performance.'" Dr. Jones's brief, at 50 (quoting Ex parte Ramsay, 829 So.2d at 155 (emphasis in Ramsay)). She argues that she has "fully performed her obligations under the agreement by continuing her employment with the University. All that remained was for the University to pay the money." Dr. Jones's brief, at 51.
This argument is patently false as it relates to theprospective relief Dr. Jones sought by way of injunction. She sought, and the trial court granted, a judgment requiring the University to "immediately raise [her] annual compensation in the amount of $4,995.00, plus any cost of living increase from 1998 until the present time." Thus, by incorporating the second installment of the raise into her current salary in accordance with the oral promise, the trial court ordered the University to pay Dr. Jones for work to be performed in the future. By definition, the contract remains executory as to work Dr. Jones has not yet performed.
"`[T]he partial performance of a contract, void under the statute of frauds, does not take it from under the influence of the statute, so as to permit a recovery under the contract for any part of the contract remaining executory.'" Ex parteRamsay, 829 So.2d at 155 (quoting Farrow v. Burns,18 Ala.App. 350, 351, 92 So. 236, 237 (1921)). Because the prospective relief awarded by the trial court was based on a portion of the contract that was manifestly executory, that portion of the judgment was barred, as a matter of law, by the Statute of Frauds. We need not determine whether the Statute of Frauds also barred the retrospective relief awarded, because that portion of the judgment was barred by sovereign immunity.
 III. Sovereign Immunity
The University argues that § 14, Ala. Const. 1901, deprives "[t]he courts [of] subject matter jurisdiction over [Dr. Jones's] claims," and this Court, therefore, "must dismiss" the action. University's brief, at 60.
Section 14 provides: "That the State of Alabama shall never be made a defendant in any court of law or equity." Speaking of § 14, this Court has said:
 "The wall of immunity erected by § 14 is nearly impregnable. Sanders Lead Co. v. Levine, 370 F.Supp. 1115, 1117 (M.D.Ala. 1973); Taylor v. Troy State Univ., 437 So.2d 472, 474 (Ala. 1983); Hutchinson v. Board of Trustees of Univ. of Alabama, 288 Ala. 20, 24, 256 So.2d 281, 284 (1971). This immunity may not be waived. Larkins v. Department of Mental Health Mental Retardation, 806 So.2d 358, 363 (Ala. 2001) (`The State is immune from suit, and its immunity cannot be waived by the Legislature or by any other State authority.'); Druid City Hosp. Bd. v. Epperson, 378 So.2d 696
(Ala. 1979) (same); Opinion of the Justices No. 69, 247 Ala. 195, 23 So.2d 505 (1945) (same); see also Dunn Constr. Co. v. State Bd. of Adjustment, 234 Ala. 372, 175 So. 383 (1937). `This means not only that the state itself may not be sued, but that this cannot be indirectly accomplished by suing its officers or agents in their official capacity, when a result favorable to plaintiff would be directly to affect the financial *Page 873 status of the state treasury.' State Docks Comm'n v. Barnes, 225 Ala. 403, 405, 143 So. 581, 582
(1932) (emphasis added); see also Southall v. Stricos Corp., 275 Ala. 156, 153 So.2d 234 (1963)."
Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala. 2002).
"Alabama A M University is an instrumentality of the State of Alabama and, thus, is absolutely immune from suit under § 14."Matthews v. Alabama Agric. Mech. Univ., 787 So.2d 691, 696
(Ala. 2000). Accord Ex parte Craft, 727 So.2d 55, 58 (Ala. 1999); Rigby v. Auburn Univ., 448 So.2d 345, 347 (Ala. 1984);Taylor v. Troy State Univ., 437 So.2d 472, 474 (Ala. 1983). Thus, actions against officers, trustees, and employees of state universities in their official capacities are likewise barred by § 14. Matthews, 787 So.2d at 697; Hutchinson v. Board ofTrustees of Univ. of Alabama, 288 Ala. 20, 256 So.2d 281 (1971); see also Milton v. Espey, 356 So.2d 1201 (Ala. 1978). "If, `at any stage of the proceedings,' the trial court, or this Court, `becomes convinced that [the action] is a suit against the State and contrary to Sec. 14 of the Constitution,' it must dismiss the action." Patterson, 835 So.2d at 154 (quoting Aland v.Graham, 287 Ala. 226, 229, 250 So.2d 677, 678 (1971)).
"This Court has recognized several species of action that are not `against the State' for § 14 purposes." Patterson, 835 So.2d at 142. Examples of these include:
 "`(1) Actions brought to compel State officials to perform their legal duties. Department of Industrial Relations v. West Boylston Manufacturing Co., 253 Ala. 67, 42 So.2d 787 [(1949)]; Metcalf v. Department of Industrial Relations, 245 Ala. 299, 16 So.2d 787 [(1944)]. (2) Actions brought to enjoin State officials from enforcing an unconstitutional law. Glass v. Prudential Insurance Co. of America, 246 Ala. 579, 22 So.2d 13 [(1945)]. . . . (3) Actions to compel State officials to perform ministerial acts. Curry v. Woodstock Slag Corp., 242 Ala. 379, 6 So.2d 479 [(1943)], and cases there cited. (4) Actions brought under the Declaratory Judgments Act, [Ala. Code 1975, § 6-6-220 et seq.], seeking construction of a statute and how it should be applied in a given situation.'"
Patterson, 835 So.2d at 142 (quoting Aland v. Graham,287 Ala. at 229-30, 250 So.2d at 679). However, "[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiff's recovery of money from the [S]tate." Shoals Cmty. College v. Colagross,674 So.2d 1311, 1314 (Ala.Civ.App. 1995) (emphasis added).
The University contends that Dr. Jones's action does not fall within any of the recognized exceptions to immunity. It takes particular issue with the retrospective relief, namely, back pay, ordered by the trial court. The University contends that, whatever the basis for the trial court's judgment, whether as compensatory damages under a breach-of-contract claim or by a writ of mandamus and injunctive relief, the award of back pay from a state university is essentially a judgment against the State for damages, and thus is barred by § 14.
 A. Recovery for Breach of Contract
The University cites Vaughan v. Sibley, 709 So.2d 482
(Ala.Civ.App. 1997). That case involved an action by Loy O. Vaughan, Jr., an "associate professor of mathematics at the University of Alabama at Birmingham (`UAB')," against the "University of Alabama Board of Trustees." 709 So.2d at 484. He sought both retrospective relief — in the form of back pay — and prospective relief through enforcement *Page 874 
of the Board's "`Rule 350-Salary Policy.'" 709 So.2d at 484. Rule 350 provided that "each faculty member [was] to be paid within an approved salary range unless the president of the campus file[d] an annual exception to the range `accompanied by the necessary documentation.'" 709 So.2d at 484.
From 1982 to 1993, Vaughan's salary was "below the minimum of the approved salary range." 709 So.2d at 484. Exceptions had been filed annually, as provided by Rule 350, only from 1982 to 1985. 709 So.2d at 484 n. 2. Vaughan argued that the Board's failure to pay him the minimum salary after 1985, without the required exceptions, "entitl[ed] him to relief that [was] not barred by the sovereign immunity clause." 709 So.2d at 485. The Court of Civil Appeals concluded "that insofar as the requested relief consist[ed] of ordering the defendants to follow the Rule 350 salary policy in the future, either by paying Vaughan the minimum salary in his approved range or by filing an annual exception to the range, § 14[did] not bar the action." 709 So.2d at 485. However, it held that Vaughan was not entitled to theretrospective relief of back pay. 709 So.2d at 486-87. In doing so, the court explained:
 "Because of the sovereign immunity clause, the courts of this state are without jurisdiction to entertain a suit seeking damages, including back pay, for breach of contract against the state. State Bd. of Adjustment v. Department of Mental Health, 581 So.2d 481 (Ala.Civ.App. 1991). Vaughan's remedy, if any, is with the Board of Adjustment. Sections 41-9-62(a)(4) and (a)(7), Code of Alabama 1975, provide:
 "`(a) The Board of Adjustment shall have the power and jurisdiction and it shall be its duty to hear and consider:
"`. . . .
 "`(4) All claims against the State of Alabama or any of its agencies, commissions, boards, institutions or departments arising out of any contract, express or implied, to which the State of Alabama or any of its agencies, commissions, boards, institutions or departments are parties, where there is claimed a legal or moral obligation resting on the state;
"`. . . .
 "`(7) All claims for underpayment by the State of Alabama or any of its agencies, commissions, boards, institutions or departments to parties having dealings with the State of Alabama or any of its agencies, commissions, boards, institutions or departments.'
 "(Emphasis added.) The Board of Adjustment has jurisdiction over claims against the state that are not justiciable in the courts because of the state's constitutional immunity from being made a defendant. Lee v. Cunningham, 234 Ala. 639, 641, 176 So. 477
(1937). The Board of Adjustment has exclusive jurisdiction over a contract claim against a state university. Alabama State University v. State Bd. of Adjustment, 541 So.2d 567 (Ala.Civ.App. 1989)."
709 So.2d at 486. See also Matthews v. Alabama Agric. Mech.Univ., 716 So.2d 1272 at 1281-82 (Ala.Civ.App. 1998) (in an action against the University by a former employee, "declaratory and injunctive relief, including reinstatement" would be available to the employee upon a determination that a contract existed and that the University breached it, but claims for retrospective relief in the form of "compensatory damages for mental distress or back pay and cost-of-living raises" were barred by sovereign immunity); Shoals Cmty. College v.Colagross, supra. *Page 875 
The holding of Vaughan with regard to retrospective relief is consistent with well-established authority. See, e.g., Stark v.Troy State Univ., 514 So.2d 46 (Ala. 1987). Stark involved an action by Paul Stark, "an assistant professor in the School of Business of Troy State University," against Troy State, its chancellor, and its chief executive officer (hereinafter collectively referred to as "Troy State"). 514 So.2d at 47. Stark alleged that Troy State had "adopted a binding policy" that provided for a "normal teaching load . . . of fifteen (15) hours of undergraduate classes," and "for full pay or salary to faculty who [taught] the equivalent of twelve quarter hours during the summer." 514 So.2d at 48. He alleged that the policy "constitut[ed] a binding contract that [the defendants were] ignoring." 514 So.2d at 48. In addition to declaratory and injunctive relief, Stark sought "compensatory damages," that is, back pay, "based upon overloads found to have been taught over the [preceding] five (5) academic years and based upon summer teaching found to have been compensated for at less than what the duly adopted policy of [Troy State] required." 514 So.2d at 48.
The trial court dismissed the claims against the university and entered a summary judgment in favor of the officials. This Court affirmed the judgment. As to the claim for retrospective relief, this Court stated:
 "[I]f the individual defendants have not acted toward the plaintiff in accordance with the rules and regulations set by the university, their acts are arbitrary and an action seeking to compel them to perform their legal duties will not be barred by the sovereign immunity clause of the Alabama Constitution of 1901; however, the action for compensatory damages cannot be maintained."
514 So.2d at 50 (emphasis added).
This principle was also applied in Milton v. Espey,356 So.2d 1201 (Ala. 1978), which involved only claims for retrospective relief. "Both Milton and Espey were employees of the University of Alabama. Milton was employed at the Ferguson Center of the University of Alabama . . . from March 1, 1973, until August 19, 1974. Espey [was] the Director of the Ferguson Center." 356 So.2d at 1202. Milton's five-count complaint purported to state claims against Espey in his individual capacity. The complaint did not purport to assert claims directly against the University of Alabama. The claims against Espey, however, included theories of breach of contract, negligence, and fraud, for which Milton sought "money damages." 356 So.2d at 1202. The breach-of-contract claims were based on allegations that the hours Milton worked exceeded those for which he was compensated. The negligence claim was based on allegations that Espey "supervised Milton in a negligent manner in that he failed to evaluate Milton as provided by the rules and regulations of the University [of Alabama]." 356 So.2d at 1202.
The trial court entered a summary judgment for Espey, and this Court affirmed that judgment as to the claims alleging breach of contract and negligence. The Court stated:
 "There is no dispute that in employing Milton, Espey was acting in his official capacity as an agent of the University [of Alabama]. Milton admits this. Espey was merely the conduit through which the University [of Alabama] contracted with Milton. Thus, a suit seeking money damages for breach of contract [and negligence], although nominally against Espey individually, *Page 876 
comes within the prohibition of Section 14 as a suit against the State. Milton's contract was in fact with the University of Alabama. . . .
 "Thus, [the breach-of-contract and negligence claims] are barred by Section 14 and summary judgment was appropriately granted as to [those claims]."
356 So.2d at 1202-03 (emphasis added).[1] Thus, Stark,Milton, Matthews, and Vaughan hold that § 14 bars retrospective relief based on a claim against a state university alleging breach of an employment contract.
In opposition to this principle, Dr. Jones cites two cases involving a contract right of the State in which a claim for back pay was allowed to proceed.[2] Ex parte Hirsch,592 So.2d 597 (Ala. 1991), and Breazeale v. Board of Trustees ofUniv. of South Alabama, 575 So.2d 1126 (Ala.Civ.App. 1991). For reasons that follow, those cases do not compel us to affirm the judgment in this case.
Ex parte Hirsch involved a class action against the Alabama State Docks Department ("the Department") by former employees of the Department, seeking "damages for breach of contract (1) for medical insurance premiums paid by [them] for their dependents, and (2) for losses caused by the denial of dependents' medical insurance claims where the denial was proximately caused by the [Department's] failure to pay the medical insurance premium." 592 So.2d at 603 (emphasis added). The dispute centered on two successive agreements between the Department and the plaintiffs' "collective bargaining representative," the "International Longshoremen's Association, Local 1984" ("the Union"), through which the Department provided group insurance for its employees. 592 So.2d at 598. The first agreement, effective April 2, 1986, did not require an employee co-payment for dependent coverage. The second agreement, effective December 1, 1987, or 1988 ("the December agreement"), "required a 28% copayment by the employee for medical insurance for dependents." 592 So.2d at 600. The case involved crucial factual and legal issues, including whether "the Union's representatives continued to represent the . . . plaintiffs after they were terminated," and, if so, whether the representation bound the plaintiffs to the December agreement. 592 So.2d at 604.
The trial court entered a summary judgment for the Department, and the Court of Civil Appeals affirmed the judgment on the ground that the action was barred by § 14. Hirsch v. AlabamaState Docks Dep't, 592 So.2d 595, 596-97 (Ala.Civ.App. 1991).
This Court reversed the judgment of the Court of Civil Appeals. In doing so, it did not discuss the sovereign-immunity defense asserted by the Department. The Court merely stated:
 "In support of their claims, the [plaintiffs] produced the documents described above, and they also produced evidence indicating that they met the contractual *Page 877 
requirements to be entitled to the medical insurance benefits. Accordingly, the [plaintiffs] presented a prima facie case indicating that their action was an action to enforce a legal duty, and the Court of Civil Appeals erred when it determined that [the plaintiffs'] action was barred by sovereign immunity."
592 So.2d at 603.
The Court acknowledged the unresolved factual and legalissues, stating: "However meritorious the defendants' [substantive] arguments may turn out to be when addressed in their complete factual background, the record will not support a summary judgment. . . . [t]here exist genuine issues of material fact, suitable for a jury's determination." 592 So.2d at 604 (emphasis added). Nevertheless, it held that a claim for damages for breach of contract involving unliquidated claims against the State was not barred by § 14. Ex parte Hirsch has never been cited in an appellate opinion, and its inexplicable holding is contrary to the authority just discussed. Stark v. Troy StateUniv., supra (sovereign immunity bars an award of compensatory damages in the form of back pay in a breach-of-contract action against a state university and university officials); Milton v.Espey, supra (relief in the form of "money damages for breach of contract" against the State is barred by § 14); and Vaughan v.Sibley, 709 So.2d at 486 ("Because of the sovereign immunity clause, the courts of this state are without jurisdiction to entertain a suit seeking damages, including back pay, for breach of contract against the state.") Cf. Williams v. Hank'sAmbulance Serv., Inc., 699 So.2d 1230, 1231 (Ala. 1997) (because of § 14, courts could not compel the Commissioner of the Alabama Medicaid Agency to "authorize retroactive payment to [medical service providers] for previous services they had provided to [Medicare beneficiaries]"). Consequently, we hereby overrule Exparte Hirsch to the extent it sanctioned a claim for damages arising out of a breach of contract involving unliquidated claims against the State.
We also disagree with Breazeale v. Board of Trustees ofUniversity of South Alabama, 575 So.2d 1126 (Ala.Civ.App. 1991), which was a "class action . . . on behalf of all nonfaculty employees of the University of South Alabama (USA)." 575 So.2d at 1127. In part, the complaint sought "retroactive monetary relief" in the form of "a recalculation of merit pay increases." 575 So.2d at 1127. The trial court granted USA's motion to dismiss on the ground of sovereign immunity. The Court of Civil Appeals reversed the judgment, "find [ing] that the [employees'] request for a recalculation of merit pay raises [was] not an action for compensatory damages as prohibited in Stark [v. Troy StateUniversity, 514 So.2d 46 (Ala. 1987)]." 575 So.2d at 1128. However, that holding is directly contrary to Stark, and is, therefore, overruled.
 B. Mandamus
The University argues that the trial court, while denying the University's summary-judgment motion, correctly concluded that "no monetary damages [could] be awarded as to the contract count," but that the court ultimately purported to accomplish the same impermissible result through a writ of mandamus or an injunction. Dr. Jones contends that "mandamus is a proper source of retroactive monetary relief in cases like this." Dr. Jones's brief, at 36 (emphasis added). In support of that proposition, she cites State Board of Administration v.Roquemore, 218 Ala. 120, 117 So. 757 (1928); Dampier v.Pegues, 362 So.2d 224 (Ala. 1978); and Hardin v. FulliloveExcavating Co., 353 So.2d 779 (Ala. 1977). However, those cases are distinguishable and turn on the well-established *Page 878 
rule that a writ of mandamus will issue to compel payment of only such claims as are liquidated. Young Women's Christian Ass'n ofPlainfield v. Gunter, 230 Ala. 521, 162 So. 120 (1935); StateBd. of Admin. v. Roquemore, 218 Ala. at 124, 117 So. at 760
("the claim asserted [against the State was] for an amount fixed or determinable by the terms of the contract of sale," and was "definite and certain, . . . not an unliquidated claim, in the sense that would render mandamus unavailable"); J.B. McCrary Co.v. Brunson, 204 Ala. 85, 86, 85 So. 396, 396 (1920) ("mandamus will not lie to compel the payment of unliquidated claims").
Dampier, for example, arose out of an action "seeking a writ of mandamus to require James C. Pegues, fiscal officer for the University of Alabama in Birmingham (UAB) and S. Richardson Hill, President of UAB, to pay [Dampier] $14,325.66 allegedly due under a contract." Dampier, 362 So.2d at 225. The complaint alleged, in pertinent part:
 "`1. On or about November 20, 1972, the plaintiff and the Board of Trustees of the University of Alabama, by and through its lawfully authorized agent, Joseph F. Volker, then President of the University of Alabama in Birmingham, entered into a written contract for the performance by plaintiff of architectural and consulting services for the construction of the Holmes Addition to Spain Rehabilitation Center at the University of Alabama Hospitals and Clinics, Birmingham, Alabama. . . .
 "`2. A sufficient sum was budgeted and available for the performance of this work according to a schedule of fees contained in said contract.
 "`3. Plaintiff performed all of the work and services called for in the architectural contract, and said services were accepted, approved and used
by the University of Alabama in Birmingham.'"
Dampier, 362 So.2d at 225.
The defendants moved to dismiss the action, and the trial court granted the motion. 362 So.2d at 225. Thus, on appeal, this Court applied the standard of review applicable to a ruling on a motion to dismiss. Under that standard, "[m]otions to dismiss should only be granted when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 362 So.2d at 225. Additionally, the reviewing Court "`must accept the allegations of the complaintas true.'" Ex parte Alabama Dep't of Youth Servs.,880 So.2d 393, 397 (Ala. 2003) (emphasis added) (quoting Creola Land Dev.,Inc. v. Bentbrooke Housing, L.L.C., 828 So.2d 285, 288 (Ala. 2002)). Considering as true the allegations that "[a] sufficient sum [had been] budgeted and [made] available for the performance of [Dampier's] work according to a schedule offees contained in said contract," that Dampier had "performedall of the work and services called for in the architecturalcontract," and that his "services [had been] accepted, approvedand used by the University of Alabama in Birmingham," the Court stated: "It is clear that if the plaintiff proved eachallegation in his complaint, his claim would" entitle him to a writ of mandamus compelling payment. Dampier, 362 So.2d at 225 (emphasis added). Thus, applying the deferential standard of review applicable to a ruling on a motion to dismiss, the Court reversed the judgment denying the petition. Id.
Similarly, Hardin involved an appeal from a judgment granting a petition for a writ of mandamus directed to "Taylor Hardin, as Commissioner, Alabama Mental Health Board, and Hugh Adams, as Director, Technical Staff, State Building *Page 879 
Commission." 353 So.2d at 780. The petition was filed by Fullilove Excavating Company, Inc. ("Fullilove"), to compel Hardin to "certify to the State Comptroller a warrant in the amount of $15,413.76 for payment" due for "excavation of certain material at the Birmingham Developmental Center of the Alabama Mental Health Board." 353 So.2d at 780. The petition alleged that Fullilove's "request for final payment on a contract performed for the Mental Health Board was approved but because of unjustified actions of Hardin and Adams, the warrant issued to Fullilove in final payment was $15,413.76 less than the amountpreviously approved for final payment." 353 So.2d at 780 (emphasis added).
Fullilove began excavating pursuant to its contract with the Mental Health Board in 1974. 353 So.2d at 782. "`Fullilove submitted requests for periodic payments for work performed under the contract which were processed through regular channels of authorities for approval.'" 353 So.2d at 782 (quoting trial court's order). In November 1974, Fullilove requested a determination by the Mental Health Board regarding the "`disposition of certain materials to be excavated.'" 353 So.2d at 782. A representative of the Mental Health Board "`determined that the material in question was "garbage" and, therefore, [classified the materials as] "unsuitable materials excavation" under the detailed classification of excavation as shown by the contract documents.'" 353 So.2d at 782. With the approval of, and notice to, the Mental Health Board, "`Fullilove removed 8,128 cubic yards of "garbage,"'" at a price of $24,384. 353 So.2d at 782.
In July 1975, Fullilove submitted a "request for periodic payment," which request "was duly approved" and paid.
353 So.2d at 782. "The [Mental Health] Board, thereafter, approved, in due course, each and every request for payment submitted by Fullilove, including the request for final payment." 353 So.2d at 782. Indeed, Fullilove's "request for final payment was approved in due course for the sum of $143,720.67." 353 So.2d at 783 (emphasis added).
However, before a warrant was issued for the final payment, Hardin and Adams changed their position on a portion of the material excavated as "unsuitable material," for which payment had already been made, and determined that it should have been characterized as "unclassified material," necessitating a reduction in the contract price. Consequently, "`a warrant was issued for the sum of $128,306.91, which represented a decrease of $15,413.76 from Fullilove's final payment.'" 353 So.2d at 783. The issue, as this Court framed it, was whether, "[a]fterapproval of final payment, including the sum of $15,413.76, [Hardin and Adams could] interpret, or reinterpret, the contract and specifications and rescind prior approval of payment." 353 So.2d at 780 (emphasis added). The Court answered that question in the negative. Without discussing § 14 expressly, the Court explained:
 "In this case the discretion of Hardin and Adams was exhausted, at the very latest, when approval was given Fullilove's final payment request if not when the July 1975 periodic payment request was approved and paid. There was no right to amend the final payment request and withhold payment of the $15,413.76 sum."
353 So.2d at 784 (emphasis added).
Dampier and Hardin thus involved judicial determinations that payment for goods or services, for which the State had contracted and accepted, could be compelled by mandamus. The application of this principle was further illustrated inMcDowell-Purcell, *Page 880 Inc. v. Bass, 370 So.2d 942 (Ala. 1979). That case involved "an appeal from a judgment [denying] the petition of . . . McDowell-Purcell, Inc. [(`Purcell'),] seeking a writ of mandamus." 370 So.2d at 943. The mandamus sought "to compel Ray D. Bass, Alabama Highway Director, to approve and cause payment to [Purcell] of monies according to [Purcell's] interpretation of the terms of a contract between it and the Alabama Highway Department and contrary to Bass'[s] interpretation." 370 So.2d at 943. This Court affirmed the judgment denying the petition.
"The contract between [Purcell] and the State of Alabama was for the construction of a section of Interstate 65 in Jefferson County. In constructing the highway it was necessary [for Purcell] to blast cuts through large rock formations consisting of shale and lime." 370 So.2d at 943. The contract required Purcell "to shore up the sides of the cuts to prevent rock slides." Id. Both the shale and limestone formations were to be secured by "rock bolts." However, securing the shale formations required, in addition to the rock bolts, the application of a layer of concrete on steel mesh. "The contract provided for the payment of four dollars per linear foot for rock bolting," and for payment of "twenty-five dollars per square yard" for application of the concrete. 370 So.2d at 943.
The dispute concerned whether the "four dollars per linear foot for rock bolting" the shale was included in, or additional to, the bid price of "twenty-five dollars per square yard" for applying the concrete mesh to the shale. Purcell "sought payment from the Highway Department of the sum of four dollars per linear foot for rock bolting" the shale, in addition to the "twenty-five dollars per square yard," and Bass refused to pay the disputed amount. When Purcell's mandamus petition was denied by the trial court, it appealed to this Court, which affirmed the denial. In doing so, it explained:
 "In limited circumstances the writ of mandamus will lie to require action of state officials. This is true where discretion is exhausted and that which remains to be done is a ministerial act. See Hardin v. Fullilove Excavating Co., Inc., 353 So.2d 779
(Ala. 1977). . . . The writ will not lie to direct the manner of exercising discretion and neither will it lie to compel the performance of a duty in a certain manner where the performance of the duty rests upon an ascertainment of facts, or the existence of conditions, to be determined by an officer in his judgment or discretion. . . .
". . . .
 "[Purcell] contends that because the required rock bolting has been completed and accepted [emphasis in original] by . . . Bass, all that remains is for Bass to perform a ministerial act: paying [Purcell] for all rock bolting at four dollars per linear foot. Were one other circumstance present we would be compelled to agree. The payment request for the rock bolting . . . has never been approved [emphasis in original] by the Highway Department. Had it been, mandamus would lie because all that would remain would be for Bass to make payment. See Dampier v. Pegues, 362 So.2d 224 (Ala. 1978); Hardin v. Fullilove Excavating Co., Inc., 353 So.2d 779 (Ala. 1977).
 "[Purcell] had constructive notice that it could not sue the State over a contract dispute. Section 14, Const. 1901. . . . In this case Bass had a duty to either approve or disapprove payment according to one of two different interpretations of the contract. Performance of that duty rested upon his judgmental or discretionary ascertainment of facts or existence of conditions to be applied under *Page 881 
the terms of the contract. The writ of mandamus will not lie to compel him to exercise his discretion and apply the ascertained facts or existing conditions under the contract so as to approve payment to [Purcell] according to its interpretation of the contract rather than his. . . .
 "We hold that the writ of mandamus will lie to compel the exercise of official discretion to interpret a contract, but absent abuse of discretion, or arbitrary or capricious exercise of discretion in the interpretation, the writ will not lie to command a given interpretation."
370 So.2d at 944 (emphasis added except as otherwise indicated).
Thus, in Roquemore, Hardin, and Dampier, the writ of mandamus issued, as McDowell-Purcell explains, only after the discretion of state officials had been exhausted. Consequently, mandamus was, in those cases, an available remedy to compel state agents to perform the essentially ministerial act of rendering payment for goods or services accepted. Cf. State of AlabamaHighway Dep't v. Milton Constr. Co., 586 So.2d 872 (Ala. 1991) (State Highway Department had no right to withhold payment from a construction company under a contractual clause held in an earlier opinion by this Court to be a void penalty provision).
That condition has not been met in this case. Dr. Jones contends that the mere continuation of her employment gives rise to a ministerial duty on the part of the University to pay the disputed salary. However, the payment of the second step of the raise required the University to ascertain a number of facts and to determine whether those facts constituted conditions precedent to the payment.
Although there is little dispute that Dr. Jones was promised a two-step raise, the question whether any conditions accompanied that promise and, if so, what those conditions were is seriously disputed. It is disputed, for example, whether the promise of the second step was extended to "Vice President" Jones, or to "Professor" Jones. In other words, was Dr. Jones's continued service as vice president for research and development a condition precedent to the University's duty to pay the second installment? Dr. Gibson and the interim provost answered that question in the affirmative.
It is undisputed that in 1994, Dr. Henson discussed a two-step raise with the executive committee of the board of trustees. It is disputed, however, whether the executive committee everauthorized such a raise. It is further disputed whether the executive committee had the authority to authorize the raise. Dr. Gibson testified that only the board of trustees could authorize the raise, and there is no contention that the board ever authorized the second step.
Unlike the periodic payment in Hardin, which was made and later rescinded by reduction of the final payment on the contract, the second installment of the raise was not initiated when the time to initiate it would have accrued. It would have accrued, at the earliest, on October 1, 1995. Although Dr. Jones did serve as vice president throughout the 1995-1996 academic year, the trial court held that she was not entitled to back pay for that year, because of the economic condition of A M from 1995 to 1998. Dr. Jones did not cross-appeal from that aspect of the judgment. Indeed, she conceded at trial that the Universityhad discretion to postpone a duly approved raise during times of economic hardship.
Under the analysis of McDowell-Purcell and the cases cited therein, mandamus will not lie to compel the University to agree *Page 882 
with Dr. Jones's version of disputed facts. Unlike the facts inDampier, the facts in this case were fully developed, and it clearly appears that the trial court was without subject-matter jurisdiction to award retrospective relief, either through a writ of mandamus or as damages under a breach-of-contract claim. We need not consider whether mandamus would lie to afford prospective relief, because that species of relief is barred by the Statute of Frauds.
 IV. Summary
In summary, we hold that the trial court erred in orderingprospective relief. More specifically, the portion of the judgment requiring the University "to immediately raise [Dr. Jones's] annual compensation in the amount of $4,995.00, plus any cost of living increase from 1998," is barred by the Statute of Frauds. We also hold that the trial court erred in awardingretrospective relief. Otherwise stated, the portion of the judgment ordering the University to "pay to [Dr. Jones] an amount equal to the compensation she would have received from the beginning of the 1998-99 academic year until the date of [the judgment] if [she] had received a raise of $4,995.00 for the 1998-99 academic year, and continuing to the [date of the judgment]," is barred by sovereign immunity. Consequently, the judgment is reversed and cause is remanded. On remand, the trial court is directed to dismiss the claims seeking retroactive relief for lack of subject-matter jurisdiction and to render a judgment for the University insofar as the claims for prospective relief are concerned.
REVERSED AND REMANDED WITH DIRECTIONS.
SEE, BROWN, HARWOOD, and STUART, JJ., concur.
HOUSTON and LYONS, JJ., concur in the rationale in part and concur in the result.
HOUSTON, Justice (concurring in the rationale in part and concurring in the result).
I concur only in the result as to Part III of the main opinion, "Sovereign Immunity." I concur fully in the remainder of the opinion.
LYONS, Justice (concurring in the rationale in part and concurring in the result).
I concur completely as to Part III of the main opinion, entitled "Sovereign Immunity." As to the remainder of the opinion, I concur in the result.
[1] The fraud claim asserted against Espey in his individual capacity alleged that Espey had acted "outside his authority and contrary to the rules and regulations of the University of Alabama." 356 So.2d at 1203. Quoting Unzicker v. State,346 So.2d 931 (Ala. 1977), the Court noted that § 14 does not shield state officials from liability for such conduct and therefore reversed the judgment in favor of Espey on the fraud claim.Milton, 356 So.2d at 1203.
[2] Gunter v. Beasley, 414 So.2d 41 (Ala. 1982), cited by Dr. Jones, is distinguishable, because it "did not involve a contract right of the state." Vaughan, 709 So.2d at 486 (discussingGunter).