BOLIN, Justice.
Gordon Moulton, the president of the University of South Alabama (“USA”); Stanley Hammaek, the vice president for Health Systems at USA and senior hospital administrator; Dr. Ronald Franks, the vice president for Health Sciences at USA; and Dr. Samuel Strada, the dean of the College of Medicine at USA (hereinafter referred to collectively as “the petitioners”), petition this Court for a writ of mandamus directing the Mobile Circuit Court to vacate its order denying the petitioners’ motion for a summary judgment and to enter an order granting that motion. We grant the petition and issue the writ.

Facts and Procedural History

A. Dr. Richard Teplick’s Employment and Termination of that Employment

On May 29, 2001, Dr. Robert A. Kries-berg, the dean of the College of Medicine and vice president for Medical Affairs for USA, notified Dr. Richard Teplick in writing that the position of chief of staff of USA Hospitals was being posted for a period of five days and invited him to complete and return an application, which was enclosed. Kriesberg listed a number of job responsibilities associated with the ehief-of-staff position and informed Teplick that the chief of staff would be a member of the senior administration of the Health Systems at USA and would report directly to him. Kriesberg also informed Teplick that the chief of staff would also hold a clinical-faculty appointment and that patient-care activities would account for no more than “20% of effort.” Kriesberg fur *1124 ther informed Teplick that the chief of staff’s salary would be guaranteed for two years and that thereafter it would be determined on a productivity-based compensation plan. Teplick applied for the chief-of-staff position and was hired on October 1, 2001. Teplick testified that when he was hired he did not enter into any written agreement and no promises were made to him regarding the length of his employment as chief of staff.
Stanley Hammack, as USA’s senior hospital administrator, testified that he disagreed with Kriesberg’s decision to create the chief-of-staff position because USA was a relatively “small operation” and the chief-of-staff position only added “an extra layer of management.” Hammack stated, however, that he supported Kriesberg’s decision to create the chief-of-staff position and to hire Teplick once Kriesberg made the decision to do so. Hammack stated that his disagreement with Kriesberg concerned the “need of the position in general, irrespective of Teplick.”[1]
Teplick initially reported directly to Kriesberg. Teplick’s duties as chief of staff included serving as a liaison between USA and the medical staff; assisting with discharge planning; assisting with quality-assurance efforts; working with third-party administrators and payors such as Blue Cross-Blue Shield; and participating in various committees relative to cost control and clinical care. In addition to his administrative duties as chief of staff, Teplick testified that he also held three separate professor positions within the USA College of Medicine, including professor of anesthesiology, surgery, and internal medicine. Teplick also stated that he held the position of associate dean within the College of Medicine. Teplick testified that his job duties within the academic positions included performing clinical work two to three months every year and lecturing to residents, fellows, and medical students. Teplick further testified that in addition to his formal job titles and duties he also served on various committees, including overseeing graduate medical education; serving on the Compliance and Ethics Committee; serving on the Billing Compliance Committee; and serving as the USA representative to the Veteran’s Administration Hospital in Biloxi, Mississippi. Teplick testified that, despite his various positions and duties, he had no decision-making authority, no direct supervisory authority over anyone, and no authority to hire or fire anyone.
Kriesberg announced his retirement in the fall of 2004, at which time Teplick began reporting to Hammack. Teplick testified that shortly after Hammack became his supervisor Hammack told him that the chief-of-staff position was not needed in the USA system “but that [Tep-lick’s] job was secure” and that “he would not hire another Chief-of-staff after [Tep-lick] left.” Subsequent to Hammack’s becoming Teplick’s immediate supervisor, some of Teplick’s duties and responsibilities were reassigned to others, including his supervisory position over the graduate-medical-education program and his position as compliance officer on the Billing Compliance Committee.
Hammack testified that soon after Kriesberg retired Teplick inquired about the status of the chief-of-staff position and that he informed Teplick that he was “not a fan” of the chief-of-staff position and that he would “see how it works.” Hammack denied telling Teplick that he would not eliminate the chief-of-staff position until after Teplick chose to leave the position. Hammack also explained that some of Tep-lick’s responsibilities and duties were reas *1125 signed at that time for the purpose of creating “broader representation, perspective and accountability” because Teplick, as chief of staff, had no one reporting directly to him.
In July 2007, Hammack began discussions with both Franks and Strada regarding the feasibility of eliminating the chief-of-staff position, including discussing the redistribution of Teplick’s duties and the projected financial savings from eliminating the position. Franks stated that these discussions centered on both the organizational and financial considerations for eliminating the position of chief of staff. Franks testified that Hammack was philosophically opposed to the chief-of-staff position but that Hammock had not predetermined to eliminate the position at the time these discussions were taking place. Stra-da also testified that the discussions centered on the organizational and financial aspects of the chief-of-staff position but that he “thought” during these discussions that the decision to eliminate the position had already been made by Hammack.
Hammack stated that he decided in the fall of 2008 to eliminate the chief-of-staff position. Hammack testified that the decision to eliminate the position was based on USA’s difficult financial situation at the time and his belief that eliminating the position would streamline USA’s operations and bring direct accountability between department chairmen and hospital administration.[2] Hammack testified that he thought eliminating the chief-of-staff position was “the most efficient thing to do and save money at the same time” and that the decision to eliminate the chief-of-staff position was not based on Teplick’s job performance. Hammack informed President Moulton of the decision to eliminate the chief-of-staff position, which decision President Moulton approved.
Hammack informed Teplick in a meeting on October 10, 2008, of the decision to eliminate the chief-of-staff position based on USA’s financial situation as well as on organizational considerations. Hammack testified that he encouraged Teplick to explore other opportunities within the USA system. On December 29, 2008, Hammack formally notified Teplick by letter that the chief-of-staff position would be eliminated effective March 31, 2009. Teplick’s employment was terminated on March 31, 2009, when the chief-of-staff position was eliminated. Teplick was the last to hold the position of chief of staff; his former functions as the chief of staff are now being carried out by others.
Teplick disputes Hammack’s contention that USA’s difficult financial situation was the reason for eliminating the chief-of-staff position. Hammack testified that, in addition to eliminating the chief-of-staff position, other cost-cutting measures were taken to address USA’s precarious financial situation. Hammack testified that medical transcriptions .were outsourced, which resulted in a savings of approximately $300,000. Hammack also testified that the air-medical-transport service operated by USA closed in 2002 and that the renal-transplant program closed “several years” later. Teplick contends that the closing of the air-medical-transport service and the renal-transplant program did not occur within close proximity to the time the chief-of-staff position was eliminated, the closing of the air-medical-transport service occurring in 2002 and the closing of the renal-transplant program, according to Hammack, occurring “several” years later. *1126 Hammack subsequently clarified that the closing of the renal-transplant program occurred “around 2009.”
Teplick testified that he offered to take a salary reduction in lieu of eliminating the ehief-of-staff position but that Hammack rejected this idea. Teplick also notes that no formal cost-benefit study was conducted concerning the ehief-of-staff position; no other high-level positions were eliminated; no salary restructuring or other job demotions were carried out; and, in some cases, high-level employees received raises. As for the outsourcing of medical transcriptions, Teplick notes that the employees affected by that outsourcing were allowed to apply for other employment at USA. He also notes that the outsourcing of medical transcriptions did not completely eliminate the function or its costs; rather, it merely reduced costs by contracting the work out.

B. Teplick’s Employment Classification

Gerald Gattis, the associate director for Human Resources at USA, testified in his affidavit that Teplick was at all times an at-will administrative employee of USA. Gattis stated that as an at-will employee Teplick served at the pleasure of his superiors and could be terminated or have his position eliminated at anytime. Gattis testified that administrative employees such as Teplick were designated by the code “110.” The designation “110” is historically the code USA gives to administrative, managerial, and executive employees to reflect that category of each employee’s associated federal “EEO skill code.” Gat-tis testified that it is very apparent to an individual designated as a “110” that he or she is different from a staff employee because of the job responsibilities and significantly higher salary of that individual. Gattis further stated that employees designated as “110” are not subject to the USA staff-employee handbook. Gattis also stated that because Teplick was designated as a “110” he was not entitled to any due process upon separation from his employment from USA. Finally Gattis testified that although some personnel-action forms listed Teplick as “staff exempt,” those listings were the result of a clerical error and a mistake because Teplick was never a staff employee of USA.
Teplick disputes his designation as a “110,” stating instead that he was a staff employee and a faculty member of USA. Staff employees have certain due-process rights upon separation from their employment at USA. In support of his contention that he was a staff employee, Teplick points to the facts that he lacked any real authority over anyone and did not have the authority “110s” generally have to hire or fire individuals; that Hammack, his immediate supervisor, described the chief-of-staff position as being of “staff orientation ... [tjhey have no one that really reports to them”; that he was designated as “staff’ on several personnel-action forms; and that he signed for and received a “University of South Alabama Staff Employee Handbook” and generally an employee designated as a “110” does not sign for or receive a staff-employee handbook.
The staff-employee handbook specifically provides:
“This handbook has been formulated to assure that all staff employees of the University of South Alabama are informed of the personnel policies and procedures of the University of South Alabama. Staff employees are employees who occupy secretarial/clerical, crafts/ trades, technical, professional and service positions. You should become familiar with these policies and procedures and keep this handbook available for use as a reference.
“Department heads, other administrative personnel and faculty are not considered to be staff and the provisions of *1127 this handbook may be used as guidelines but do not necessarily apply to them. Department heads and other administrative personnel should, however, be familiar with the provisions of this handbook as they are responsible for its administration. Should issues or questions arise regarding this handbook, the department head or supervisor should contact the Human Resources Office for clarification.”
The receipt for the handbook, signed by Teplick, provides, in part, as follows:
“I further understand that I am required to read and become familiar with all the provisions of these policies, and my supervisor or department head will answer any questions concerning the policies.
“I understand that neither this handbook nor any provision of this handbook is or implies an employment contract or any other type of contract. I also understand that my employment is for an indefinite term and may be terminated at any time at the will of either the employee or the University.”
Gattis testified that “110s” may receive a copy of the “University of South Alabama Staff Employee Handbook” to use as a management tool because it allows them to familiarize themselves with the rules applicable to their department. Gattis further testified that if a staff employee was terminated or suspended that employee would have certain due-process rights under the staff-employee handbook; however, a staff employee has no due-process rights under the handbook if the employee loses his employment- because his or her position has been eliminated by USA.
Teplick contends that he was also a faculty member at USA and as such was also entitled to certain due-process rights applicable to faculty members pursuant to the faculty handbook. Strada, the dean of the College of Medicine, testified that “regular” faculty members, both tenured and non-tenured, have due-process rights upon being dismissed from their positions, but that “adjunct” faculty have no due-process rights upon being dismissed. Both Strada and Franks testified that an individual could hold dual status as a “110,” a staff employee, and a faculty member. Franks testified that he was both a “110” and a faculty member.
As discussed above, Teplick stated that within the College of Medicine he held the position of “professor” of anesthesiology and surgery, of “professor” of internal medicine, and of associate dean. Teplick testified that he was never an adjunct appointee. Teplick testified that in the academic positions within the College of Medicine he performed clinical work and lectured. Teplick testified that part of his salary was initially paid by the medical school. Teplick also references, in support of his contention that he was a regular faculty member, his designation as a “professor” on the “Memorand[a] of Reappointment” to the Department of Anesthesiology and Surgery for his final two years of employment, which were signed by Strada, in his capacity as dean of the College of Medicine.
Strada testified that Teplick was an adjunct professor in the College of Medicine from 2001 until 2009. Strada testified that Teplick’s adjunct professorship was unfunded and that the College of Medicine did not pay him a salary for his adjunct appointment; rather, Teplick was “paid solely as the Chief of Staff from the hospital side of USA.” Teplick was expressly informed on October 9, 2001, at the time of his initial appointment as an adjunct professor, that the appointment was a “non-tenure accruing appointment” that did not include any “additional compensation.” Strada testified that Teplick was never a *1128 regular faculty member at USA and that his faculty position was at all times “honorific and voluntary in nature,” and as such Teplick was not afforded the due-process rights pursuant to the USA faculty handbook. The record before this Court contains Teplick’s “Memorandum of Reappointment” to the College of Medicine for each of the years 2001 through 2006. These memoranda specifically designate Teplick as an adjunct professor, contrary to Teplick’s testimony that he was never designated as an adjunct professor.[3] Stra-da testified that the “Memorandum of Reappointment” for each of the years 2007 and 2008 refers to Teplick as a “professor” because Teplick came to him and asked that the word “adjunct” be dropped from the memorandum because, he said, Teplick did not “like” the word adjunct. Strada stated that he agreed to drop the word “adjunct” from the memorandum but that it did not change Teplick’s designation as an adjunct professor. Strada also testified that Teplick’s title of associate dean was one created by Kriesberg for Teplick and that the title was honorific in nature and no salary was associated with it.
Strada testified that, as an adjunct professor, Teplick was never subject to promotion consideration; was never required to publish scholarly articles; and was never required to be evaluated in his professorial duties. Strada also testified that the elimination of the chief-of-staff position had no effect on Teplick’s adjunct professorship and that the adjunct professorship was not rescinded when Teplick’s employment as chief of staff ended in March 2009. Strada stated that Teplick never inquired about the status of his adjunct appointment following the elimination of the chief-of-staff position. Teplick himself stated that he was aware that he held the adjunct appointment through August 2009.

C. Teplick’s Post-Employment Negotiations

On June 9, 2009, after the position as chief of staff was eliminated, Strada received a request from the chairman of the Department of Medicine requesting that Teplick be appointed as an adjunct professor in that department. Teplick responded to the chairman, indicating that a request for appointment was not required at that time because Teplick retained his previous appointment, which was not affected by the elimination of the chief-of-staff position, through August 2009. Strada testified that in August 2009 letters were sent to the various departments requesting that they identify those adjunct professors they wished to reappoint for the coming school year. Strada testified that the surgery department chose not to reappoint Teplick as an adjunct professor. Strada further testified that the chairman of the Department of Medicine failed to respond at all to the inquiries as to whether that department was going to reappoint Teplick as an adjunct professor.
Following the elimination of the position as chief of staff, Teplick explored other job opportunities within the USA system. In the summer of 2009, Teplick was in negotiations with Franks to accept a position in the College of Medicine’s simulation program. On August 7, 2009, Franks extended by letter an offer to Teplick of a 12-month contract for a position in the College of Medicine with a salary “in the range of $40-50,000, subject to further discussions and negotiations.” The offer would have required Teplick to execute a release indicating that he would not file a complaint against USA arising out of the *1129 elimination of the chief-of-staff position. This letter was preceded by a meeting on August 6, 2009, between Teplick and Franks, in which a “heated” argument occurred between the two over the new position in the College of Medicine being offered to Teplick. Teplick testified that he did not respond to the offer in the August 7, 2009, letter, stating that it was “unacceptable,” “insulting,” and “absurd.”

D. Procedural History of Case

On February 5, 2010, Teplick filed his first amended complaint[4] asserting claims against the petitioners in both their official and individual capacities. Teplick alleged in count I of the complaint that the petitioners had violated his due-process rights by terminating him without providing him certain due process he alleges he was entitled to as both a staff member and a faculty member and that, in violating his due-process rights, the petitioners acted in bad faith and/or beyond their authority and/or under a mistaken interpretation of the law. As to count I, Teplick sought damages for emotional distress, punitive damages, backpay, reinstatement or “front pay” in lieu of reinstatement, an attorney fee, and any other legal or equitable relief to which he was entitled.
Teplick asserted in count II of the complaint a fraud claim against Hammack arising out of the alleged representation to him by Hammack that Teplick’s position as chief of staff was “secure.” As to count II, Teplick sought both compensatory and punitive damages, an attorney fee, and any other legal or equitable relief to which he was entitled.
Teplick asserted in count III of the complaint a claim of “malice” against Strada, alleging that Strada intentionally withheld an appointment as an adjunct professor from him, resulting in his being harmed. As to count III, Teplick sought both compensatory and punitive damages, an attorney fee, and any other legal or equitable relief to which he was entitled.
The petitioners answered the complaint, raising, among other defenses, the defenses of State immunity under Art. I, § 14, Ala. Const.1901, and State-agent immunity set forth in Ex parte Cranman, 792 So.2d 392 (Ala.2000), and adopted by this Court in Ex parte Butts, 775 So.2d 173 (Ala.2000).
On January 17, 2012, the petitioners moved the trial court for a summary judgment, arguing that all the claims asserted against them were barred by State immunity and State-agent immunity. On March 7, 2012, Teplick filed his response in opposition to the petitioners’ summary-judgment motion. On May 22, 2012, the trial court entered an order denying the petitioners’ motion for a summary judgment without making any findings of fact or conclusions of law. This petition followed.

Standard of Review

This Court has stated:
‘“While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala.1996)
[[Image here]]
“ ‘Summary judgment is appropriate only when “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala.1996). A court considering a motion for summary judg *1130 ment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala.1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala.1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala.1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala.1998).
“ ‘An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala.1991), Boland v. Fort Rucker Nat’l Bank, 599 So.2d 595 (Ala.1992), Rowe v. Isbell, 599 So.2d 35 (Ala.1992).’ ”
Ex parte Tuner, 840 So.2d 132, 135 (Ala.2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala.2000)). A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: “ ‘(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.’ ” Ex parte Nall, 879 So.2d 541, 543 (Ala.2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001)).

Discussion

A. Official-Capacity Claims

The petitioners argued in their motion for a summary judgment, and they argue again in this petition, that they are absolutely immune from the claims asserted against them in their official capacities under the State immunity afforded them by§ 14.
“ ‘It is settled beyond cavil that State officials cannot be sued for damages in their official capacities. Burgoon v. Alabama State Dep’t of Human Res., 835 So.2d 131, 132-33 (Ala.2002).’ Ex parte Dangerfield, 49 So.3d [675,] 681 [ (Ala.2010) ].”
Ex parte Montgomery Cnty. Bd. of Educ., 88 So.3d 837, 842 (Ala.2012). In Vandenberg v. Aramark Educational Services, Inc., 81 So.3d 326, 332 (Ala.2011), this Court stated:
“This Court has held that the immunity afforded the State by § 14 applies to instrumentalities of the State and State officers sued in their official capacities when such an action is effectively an action against the State. Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003). We have specifically ‘extended the restriction on suits against the State found in § 14 “to the state’s institutions of higher learning” and ha[ve] held those institutions absolutely immune from suit as agencies of the State.’ Ex parte Troy Univ., 961 So.2d 105, 109 (Ala.2006) (quoting Taylor v. Troy State Univ., 437 So.2d 472, 474 (Ala.1983)). This § 14 bar also prohibits ‘actions against officers, trustees, and employees of state universities in their official capacities.’ Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004).”
In Alabama Department of Transportation v. Harbert International, Inc., 990 So.2d 831, 839-840 (Ala.2008), this Court stated:
“To determine whether an action against a State officer is, in fact, one against the State, this Court considers
*1131 “‘whether “a result favorable to the plaintiff would directly affect a contract or property right of the State,” Mitchell [v. Davis, 598 So.2d 801, 806 (Ala.1992) ], whether the defendant is simply a “conduit” through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So.2d 770, 784 (Ala.1988), and whether “a judgment against the officer would directly affect the financial status of the State treasury,” Lyons [v. River Road Constr., Inc.], 858 So.2d [257] at 261 [ (Ala.2003) ].’
“Haley [v. Barbour County ], 885 So.2d [783] at 788 [ (Ala.2004) ]. Additionally, ‘[i]n determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought.’ Ex parte Carter, 395 So.2d 65, 67-68 (Ala.1980).”
This Court also noted in Harbert that the immunity afforded State officers sued in their official capacities is not unlimited:
“ ‘[Section 14] immunity from suit does not extend, in all instances, to officers of the State acting in their official capacity. Unzicker v. State, 346 So.2d 931 (Ala.1977). In limited circumstances the writ of mandamus will lie to require action of state officials. This is true where discretion is exhausted and that which remains to be done is a ministerial act. See Hardin v. Fullilove Excavating Co., Inc., 353 So.2d 779 (Ala.1977); Tennessee & Coosa R.R. Co. v. Moore, 36 Ala. 371 (1860). Action may be enjoined if illegal, fraudulent, unauthorized, done in bad faith or under a mistaken interpretation of law. Wallace v. Board of Education of Montgomery Co., 280 Ala. 635, 197 So.2d 428 (1967). If judgment or discretion is abused, and exercised in an arbitrary or capricious manner, mandamus will lie to compel a proper exercise thereof. The writ will not lie to direct the manner of exercising discretion and neither will it lie to compel the performance of a duty in a certain manner where the performance of that duty rests upon an ascertainment of facts, or the existence of conditions, to be determined by an officer in his judgment or discretion. See Barnes v. State, 274 Ala. 705, 151 So.2d 619 (1963).’
“McDowell-Purcell, Inc. v. Bass, 370 So.2d 942, 944 (Ala.1979).
“Moreover, certain causes of action are not barred by § 14:
““‘There are four general categories of actions which in Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1971), we stated do not come within the prohibition of § 14: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; and (4) actions brought under the Declaratory Judgments Act ... seeking construction of a statute and its application in a given situation. 287 Ala. at 229-230, 250 So.2d 677. Other actions which are not prohibited by § 14 are: (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law. Wallace v. Board of Education of Montgomery County, 280 Ala. [635] at 639, 197 *1132 So.2d 428 [ (1967) ]; Unzicker v. State, 346 So.2d 931, 933 (Ala.1977); Engelhardt v. Jenkins, 273 Ala. 352, 141 So.2d 193 (1962).” ’
“Drummond Co. v. Alabama Dep’t of Transp., 937 So.2d 56, 58 (Ala.2006) (quoting [Ex parte] Carter, 395 So.2d [65,] 68 [ (Ala.1980) ]) (emphasis omitted). These actions are sometimes referred to as ‘exceptions’ to § 14; however, in actuality these actions are simply not considered to be actions ‘“against the State” for § 14 purposes.’ Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002). This Court has qualified those ‘exceptions,’ noting that ‘ “[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiffs recovery of money from the [S]tate.” ’ Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004) (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995)) (emphasis added in Jones).”
990 So.2d at 839-40.
Teplick concedes that his claims against the petitioners in their official capacities seeking monetary damages, including backpay, “front” pay, and an attorney fee, are barred by § 14. However, Teplick argues that he also sought injunctive relief from the petitioners in their official capacities in the form of reinstatement to the position of chief of staff. Teplick contends that his requested equitable relief is excepted from the bar of State immunity. See Harbert, 990 So.2d at 840.
The petitioners argue that Teplick failed to plead a claim for injunctive relief in his complaint. We note that pleadings are to be liberally construed in order to effect the purpose of the Alabama Rules of Civil Procedure and that every reasonable intendment and presumption must be made in favor of the pleader. See Rule 8, Ala. R. Civ. P.; Ex parte International Refining & Mfg. Co., 972 So.2d 784, 789 (Ala.2007). Teplick’s cause of action in count I of the complaint is based on an alleged violation of his due-process rights. However, he does request certain injunc-tive relief in the form of reinstatement to the position of chief of staff. Although count I of the complaint is not a model pleading, it sufficiently apprises the petitioners of Teplick’s requested injunctive relief. Considering the liberal construction pleadings are to be given, we conclude that Teplick’s complaint adequately states a claim for injunctive relief.
The petitioners next argue that Teplick did not respond to the arguments in their motion for a summary judgment that his claims against them in their official capacities are barred by the doctrine of State immunity. Thus, the petitioners contend that Teplick has waived any argument in that regard and that the claims asserted against them in their official capacities should be dismissed. This Court has stated:
“[T]his Court will affirm the trial court on any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court. Ex parte Ryals, 773 So.2d 1011 (Ala.2000), citing Ex parte Wiginton, 743 So.2d 1071 (Ala.1999), and Smith v. Equifax Servs., Inc., 537 So.2d 463 (Ala.1988). This rule fails in application only where due-process constraints require some notice at the trial level, which was omitted, of the basis that would otherwise support an affirmance, such as when a totally omitted affirmative defense might, if available for consideration, suffice to affirm a judgment, Ameriquest Mortgage Co. v. Bentley, 851 So.2d 458 (Ala.2002), or where a summary-judgment movant has *1133 not asserted before the trial court a failure of the nonmovant’s evidence on an element of a claim or defense and therefore has not shifted the burden of producing substantial evidence in support of that element, Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala.2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and Kennedy v. Western Sizzlin Corp., 857 So.2d 71 (Ala.2003)).”
Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003). Although Teplick failed to offer any argument in opposition to the petitioners’ State-immunity argument in their motion for a summary judgment, Teplick’s requested in-junctive relief in count I of the complaint was sufficient to put the petitioners on notice that he was seeking injunctive relief so as not to bar application of the rule that this Court will affirm the judgment of the trial court “on any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court.” 881 So.2d at 1020. Accordingly, we conclude that Teplick has not waived the argument that his claim for injunctive relief is excepted from the bar of State immunity.
If Teplick’s claim for injunctive relief is to survive the bar of State immunity, we must determine whether that claim falls ■within one of the recognized “exceptions” to State immunity set forth above. To the extent that Teplick has requested reinstatement to the position of chief of staff based on his claims that his employment was terminated without his being provided certain due-process rights and that the alleged violation of his due-process rights was done in bad faith and/or beyond authority and/or under a mistaken interpretation of the law, Teplick has conceivably asserted a claim under the first and sixth “exceptions” to the bar of State immunity as set forth in Harbert, 990 So.2d at 840.

1. First “Exception” to State Immunity

The first “exception” provides that “actions brought to compel State officials to perform their legal duties” are not barred by the doctrine of State immunity. Harbert, 990 So.2d at 840. Teplick contends that the petitioners were required to provide him with due process upon the elimination of his position as chief of staff and that they failed to do so.[5] Teplick has no due-process claim unless he had a property interest in continued employment with USA. Board of Regents of State Colls. v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). “ ‘[A] state employee who under state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for dismissal may demand the procedural protections of due process.’” Stallworth v. City of Evergreen, 680 So.2d 229, 233 (Ala.1996) (quoting Goss v. Lopez, 419 U.S. 565, 573, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). In Roth, supra, the Supreme Court of the United States discussed what constitutes a constitutionally protected property interest:
“To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institu *1134 tion of property to protect those claims upon which people rely in them daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
“Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.”
408 U.S. at 577. On the other hand, Alabama recognizes an employer’s right to terminate an at-will employee for any reason. Tyson Foods, Inc. v. McCollum, 881 So.2d 976 (Ala.2003). Employment at-will is not a property interest that requires due process upon termination of the employment. Williams v. Walker, 526 So.2d 576 (Ala.1988); Boyett v. Troy State Univ. at Montgomery, 971 F.Supp. 1403 (M.D.Ala.1997).

a. Staff-Employee Status

Teplick argues that he was entitled to due process following the elimination of the chief-of-staff position because, he argues, he was a staff employee and, as a staff employee, was entitled to certain due process pursuant to the staff-employee handbook.
The petitioners made a prima facie showing that Teplick was an at-will administrative employee of USA. Kriesberg’s letter of May 29, 2001, expressly notified Teplick that the “Chief of Staff would be a member of the Senior Administration.” Gattis, director of Human Resources for USA, testified that Teplick was designated as a “HO,” a designation given administrative employees, and that Teplick was at all times an at-will administrative employee of USA. Gattis testified that it is very apparent to an individual designated as a “110” that he or she is different from a staff employee because of the job responsibilities and significantly higher salary given to that individual. Gattis further stated that because Teplick was designated a “110,” he was not entitled to any due process afforded by the staff-employee handbook upon separation from his employment at USA.
Teplick refuted his designation as a “110” administrative employee by presenting evidence that he lacked any real authority over anyone and that he did not have the authority to hire or fire individuals. He also pointed to Hammack’s description of the chief-of-staff position as being of “staff orientation ... [t]hey have no one that really reports to them.” Tep-lick also noted that was designated as “staff’ on several personnel-action forms and that he signed for and received a “University of South Alabama Staff Employee Handbook” that employees designated as “110s” generally do not receive.
Hammack’s statement describing the chief-of-staff position as “staff orientation ... they have no one that really reports to them” was made in the context of describing the chief of staffs functions. Teplick’s position as chief of staff was similar to a staff position in that he had no supervisory authority and no one reported directly to him. However, his duties serving as a liaison between USA and the medical staff; assisting with discharge planning; assisting with quality-assurance efforts; working with third-party administrators and payors, such as Blue Cross-Blue Shield; and participating in various committees relative to cost control and clinical care were certainly administrative in nature. As for Teplick’s contention that he received a staff-employee handbook, Gattis explained that “110s” may receive a copy *1135 of the staff-employee handbook to use as a management tool to familiarize themselves with the rules applicable to their department. Gattis further explained that although some personnel-action forms listed Teplick as “staff exempt,” those listings were the result of a clerical error and a mistake because Teplick was never a staff employee of USA. Teplick offered nothing to dispute this testimony from Gattis.
We note that Section 8.3.6 of the staff-employee handbook defines “layoff’ as a “separation of employment due to ... abolishment of a position or positions necessitated by a shortage of funds ... or a material change in the duties of the position.” Pursuant to § 6.1 of the handbook, “layoffs” are not subject to the filing of a grievance and/or an appeal. Gattis affirmed this interpretation of the staff-employee handbook in his testimony, stating that a staff employee has no due-process rights under the handbook if the employee loses his or her employment because his or her position has been eliminated by USA. Therefore, assuming the evidence supported Teplick’s contention that he was a staff employee of USA, Teplick would still not be entitled to a due-process hearing under the terms of the staff-employee handbook.[6]
The overwhelming evidence indicates that Teplick was not a staff employee of USA but was an at-will administrative employee of USA and was not entitled to the due-process rights afforded the staff employees under the staff-employee handbook. Accordingly, we conclude that Tep-lick has no due-process rights based on his contention that he was a staff employee of USA.

b. Faculty-Member Status

Teplick contends that he enjoyed dual status as a staff employee and as a faculty member. Teplick argues that as a faculty member of USA, he was entitled to certain due-process rights that are afforded faculty members under the faculty handbook.
The petitioners made a prima facie showing that Teplick was not a regular faculty member of USA and, therefore, was not entitled to the due process afforded faculty members in the faculty handbook. Strada testified that Teplick was an adjunct professor in the College of Medicine from 2001 until 2009; that Teplick’s adjunct professorship was unfunded; that the College of Medicine did not pay him a salary for his adjunct appointment; and that Teplick was “paid solely as the Chief of Staff from the hospital side of USA.” Strada further testified that Teplick was never a regular faculty member at USA and that his faculty position was at all times “honorific and voluntary in nature.” Teplick was expressly informed upon his initial appointment as an adjunct professor that the appointment did not include any additional compensation. The petitioners also presented Teplick’s “Memorand[a] of Reappointment” to the College of Medicine for the years 2001 through 2006, which specifically designated Teplick as an adjunct professor. These “Memorandfa] of Reappointment” directly refute Teplick’s testimony that he was never designated an adjunct professor. Finally, Strada testified that Teplick was never subject to promotion consideration as a faculty member and was never required to be evaluated in his professorial duties as were regular faculty members.
*1136 Teplick presented evidence indicating that he held the positions of “professor” of anesthesiology and surgery; “professor” of internal medicine; and associate dean within the College of Medicine. Teplick stated that he regularly lectured and performed clinical work as part of his faculty duties within the College of Medicine. Teplick also referenced, in support of his contention that he was a regular faculty member, his designation as a “professor” on the “Memorand[a] of Reappointment” to the Department of Anesthesiology and Surgery for his final two years of employment at USA and the fact that there was no reference to him on those memoranda as being an adjunct professor.
We note that Teplick’s faculty duties of lecturing and performing clinical work were entirely consistent with his designation by USA as an adjunct professor. As for Teplick’s “Memorand[a] of Reappointment” for the years 2007 and 2008, which refer to him as “professor” as opposed to “adjunct professor,” Strada testified that Teplick came to him and asked that the word “adjunct” be dropped from the memorandum because Teplick did not “like” the word “adjunct.” Strada stated that, although he agreed to drop the word “adjunct” from the “Memorandfa] of Reappointment,” doing so did not change Tep-lick’s designation as an adjunct professor. All previous “Memorand[a] of Reappointment” clearly designate Teplick as an adjunct professor. Additionally, Teplick received no compensation from USA, other than his compensation as chief of staff, following his designation as “professor” in the “Memorand[a] of Appointment” for the years 2007 and 2008.
Again, the overwhelming evidence indicates that Teplick was not a regular faculty member of USA and that, therefore, he was not entitled to the due-process rights afforded regular faculty members pursuant to the faculty handbook.
c. Alleged Offer of Permanent Employment
Teplick contends that Ham-mack's alleged statement regarding “secure” employment altered his at-will status and created a property interest in his continued employment at USA. This Court has stated:
“It has long been the law in Alabama that employment is terminable at will by either party for any reason unless there is an express and specific contract for lifetime employment or employment for a specific duration. ‘[A]bsent an agreement on a definite term, any employment is considered to be “at-will,” and may be terminated by either party, with or without cause or justification.’ Clark v. America’s First Credit Union, 585 So.2d 1367, 1369 (Ala.1991). Furthermore, employees in Alabama bear a heavy burden of proof to establish that an employment relationship is other than ‘at will.’ The law considers lifetime or permanent employment contracts to be extraordinary and not lightly to be implied. Alabama Mills, Inc. v. Smith, 237 Ala. 296, 301, 186 So. 699, 704 (1939).”
Howard v. Wolff Broad. Corp., 611 So.2d 307, 310-11 (Ala.1992). In order to overcome the presumption of an “at-will” employment status, one must demonstrate:
“ ‘(1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration, Bates v. Jim Walter Resources, Inc., 418 So.2d 903 (Ala.1982); (2) that the hiring agent had authority to bind the principal to a permanent employment contract, Alabama Mills, Inc. v. Smith, 237 Ala. 296, 186 So. 699 (1939); and (3) that the employee provided substantial consideration for the contract separate from the *1137 services to be rendered, United Security Life Ins. Co. v. Gregory, 281 Ala. 264, 201 So.2d 853 (1967).’ ”
Wright v. Dothan Chrysler Plymouth Dodge, Inc., 658 So.2d 428, 430 (Ala.1995) (quoting Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725, 728 (Ala.1987)).
Teplick argues that Hammack’s alleged statement to him that his job “was secure” and that Hammack “would not hire another Chief of Staff after [Teplick] left” constitutes an offer of permanent employment so as to give him a property interest in his employment at USA. We note the following testimony from Teplick regarding Hammack’s alleged offer of secure employment:
“Q. [Counsel for petitioners:] Did anyone tell you that your job was absolutely inviolate from being eliminated?
“A. Yes.
“Q. Who was that?
“A. Mr. Hammack.
“Q. When did he tell you that?
“A. Shortly after he took over as my supervisor after Kriesberg left he told me that the position of chief of staff was one that he didn’t think was needed in this institution but that my job was secure. He would not hire another chief of staff after I left.
[[Image here]]
“Q. Did he say anything beyond that? For example how long you would have the job? Did he discuss an amount of time?
“A. His indication was until I chose to leave.
“Q. Did he say until you choose to leave?
“A. No.
[[Image here]]
“Q. I believe when you talked about exactly what he said I believe you didn’t say he said anything about until you chose to leave?
“A. No. What he said is after you leave we will not hire — I don’t remember the exact words, the implication was that the job would persist until I left— chose to leave.
“Q. He never looked at you and said you are going to have this job until the time you decide to go?
“A. No. He certainly implied it.
“Q. How?
“A. In the conversation by saying the job would, will persist until you leave after which we will not hire another chief of staff. My assumption from the conversation, the implication to me was that the job would continue to exist until I chose to leave.
“Q. No one ever told you that?
“A. Not in those words.
[[Image here]]
“Q. To just be totally clear, the words ‘until you chose to leave,’ no one ever said those words to you?
“A. Not as I recall. There was a strong implication.
[[Image here]]
,“Q. Did you tell anyone there that you had a reason to believe you had a permanent entitlement?
“A. Anyone where?
“Q. At USA? Did you go to anyone and say I thought I was going to have this job forever or as long as I wanted?
“A. I don’t recall.
“Q. You are not stating that anyone ever made you such a broad promise?
“A. Not in those words, no.
“Q. Or in any words close to that?
“A. Close enough that I drew the inference.
[[Image here]]
*1138 “Q. You don’t have any contract that would have guaranteed your employment with USA beyond March 2009 in any capacity?
“A. No.”
Based on the foregoing, we conclude that there was no “clear and unequivocal offer of lifetime employment or employment of definite duration” as required to overcome the employee-at-will status. 658 So.2d at 430. Teplick admitted during his deposition testimony that Hammack made no definite offer of employment for a definite time; rather, Teplick testified that based on his conversation with Hammack there was only an “implication” of continued employment for a definite time. We further note that the alleged “offer” was made, not during the course of negotiating an employment contract, but following a realignment of management at USA. In Chastain v. Kelly-Springfield Tire Co., 733 F.2d 1479, 1480 (11th Cir.1984), the court held that the words — similar to the ones alleged to have been spoken in this case — “jobs [were] secure; that we would continue on like we had been,” made in the context of a merger and not during the negotiation of an employment contract, did not constitute an offer of permanent employment but an offer of employment terminable at will.
Accordingly, because Teplick has failed to present substantial evidence of a “clear and unequivocal offer of lifetime employment or employment of definite duration,” he has failed to overcome the presumption that he was an at-will employee.
In sum, Teplick argued that he had a protected property interest in his continued employment as chief of staff at USA entitling him to due process based on his alleged status as a staff member and a faculty member and on the alleged promise of permanent employment. Teplick has failed to present substantial evidence indicating that he was a staff member or a faculty member or that an offer of permanent employment was made to him. Therefore, Teplick has failed to demonstrate that he had a protected property interest in his continued employment at USA. Because Teplick failed to establish that he had a protected property interest in his continued employment as chief of staff at USA, the petitioners owed him no legal duty to provide him with due process before eliminating his position as chief of staff. Likewise, the petitioners owe Tep-lick no legal duty to reinstate him to the chief-of-staff position based on their alleged failure to provide him with due process. Because the petitioners owed Tep-lick no legal duty, his action cannot be one “brought to compel State officials to perform their legal duties,” Harbert, 990 So.2d at 840, so as to come within the first “exception” to the bar of State immunity.
2. Sixth “Exception” to State Immunity
The Sixth “exception” to the bar of State immunity is currently stated as follows: “[Ajctions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law.” Harbert, 990 So.2d at 840 (quoting Drummond, 937 So.2d at 58, quoting in turn Ex parte Carter, 395 So.2d 65, 68 (Ala.1980)). In addressing the applicability of this “exception” to this case, we take the opportunity to clarify the “exception,” because as formulated in Harbert and other authorities, the “exception” is misleading and contradictory to long-established principles of law relative to State immunity under § 14.
In Ex parte Thomas, 110 So.3d 363 (Ala.2012), a group of correctional officers employed by the Alabama Department of Corrections (“ADOC”) sued ADOC and its *1139 then commissioner Richard Allen alleging that ADOC was violating its own regulations and State law in the manner in which it: (1) compensated correctional officers for overtime; (2) restricted the way correctional officers were allowed to use earned leave; and (3) paid correctional officers the daily subsistence allowance provided by law. The correctional officers sought, among other things, injunctive relief, as well as money damages, to include backpay with interest, punitive damages, and litigation costs and expenses, including attorney fees.
ADOC and Allen moved the trial court to dismiss the correctional officers’ claims for money damages, arguing that ADOC and Allen were entitled to State immunity under § 14. Before the trial court ruled on that motion, however, the correctional officers filed an amended complaint adding the Alabama Corrections Institution Finance Authority (“ACIFA”) as a defendant and asserting claims against Allen in his capacity as vice president of ACIFA. The trial court entered an order denying ADOC and Allen’s motion to dismiss. Thereafter, ADOC, ACIFA, and Allen filed an answer to the correctional officers’ amended complaint.
ADOC, ACIFA, and Kim Thomas, who succeeded Allen as commissioner of ADOC and vice president of ACIFA on January 17, 2011, moved the trial court to enter a partial summary judgment in their favor, arguing that the correctional officers’ claims seeking money damages from ADOC were barred by the doctrine of State immunity and that the claims against ACIFA had no factual or legal basis. Following a hearing on the motion for a summary judgment, the trial court entered an order denying the motion without stating its rationale. ADOC, ACIFA, and Thomas petitioned this Court for a writ of mandamus.
ADOC and Thomas argued in their petition that the correctional officers’ claims against them for money damages, including backpay, were barred by the doctrine of State immunity under § 14. However, relying upon the sixth “exception” stated above, the correctional officers argued that ADOC and Thomas were not entitled to State immunity as to the damages claim because, they said, Thomas’s actions had been and continued to be willful, malicious, fraudulent, in bad faith, and based on a mistaken interpretation of the law. This Court stated:
“This Court did recognize in Drummond [Co. v. Alabama Department of Transportation, 937 So.2d 56 (Ala.2006),] that ‘ “actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law”’ are not prohibited by § 14. Drummond, 937 So.2d at 58 (quoting Ex parte Carter, 395 So.2d 65, 68 (Ala.1980)). However, in Alabama Department of Transportation v. Harbert International, Inc., 990 So.2d 831, 840 (Ala.2008), we further explained the ‘exceptions’ to State immunity discussed in Drummond, and our holding in Harbert International makes clear that the ‘exception’ the correctional officers now seek to rely upon is not applicable in this case:
“ ‘These actions [against the State that are not barred by § 14 and that are discussed in Drummond ] are sometimes referred to as “exceptions” to § 14; however, in actuality these actions are simply not considered to be actions “‘against the State’ for § 14 purposes.” Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002). This Court has qualified those *1140 “exceptions,” noting that “ ‘[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiffs recovery of money from the [S]tate.’” Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004) (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995)) (emphasis added in Jones).’ ”
Ex parte Thomas, 110 So.3d at 370.
This Court concluded that because the correctional officers were seeking money damages from the State, the relied-upon “exception” in Drummond did not apply, and their claims for money damages against Thomas were barred by § 14. Further, this Court noted that ADOC would still be entitled to State immunity even if the correctional officers’ claims against Thomas were permitted by Drum-mond because “ ‘these “exceptions” to [State] immunity apply only to actions brought against State officials; they do not apply to actions against the State or against State agencies.’ ” Ex parte Thomas, 110 So.3d at 370 (quoting Ex parte Alabama Dep’t of Fin., 991 So.2d 1254, 1257 (Ala.2008)).
Justice Shaw, concurring specially in Ex parte Thomas, pointed out the contradiction in the sixth “exception” we now seek to resolve:
“I note that, although the ‘exception’ in Drummond the correctional officers seek to apply states that ‘actions for ... damages’ may be pursued, such ‘actions’ refer to only certain limited actions ‘against State officials ... individually ...,’ because actions for damages against officials in their ‘representative’ or official capacities are actually actions seeking to recover money from the State and are, thus, barred. Burgoon v. Alabama Dep’t of Human Res., 835 So.2d 131, 133 (Ala.2002) (‘A suit against a State agency, or against State agents in their official capacities, is a suit against the State.’). Even those actions against State officials in their individual capacities, however, may still be barred by § 14, Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989) (‘State officers and employees, in their [individual capacities,] ... are absolutely immune from suit when the action is, in effect, one against the State.’), or by State-agent immunity under Ex parte Cranman, 792 So.2d 392 (Ala.2000).”
Ex parte Thomas, 110 So.3d at 371.
Indeed, it is well established that actions for damages against State agents in their official or representative capacities are considered actions to recover money from the State and are barred by State immunity under § 14. Harris v. Owens, 105 So.3d 430 (Ala.2012); Ex parte Montgomery Cnty. Bd. of Educ., supra; Vandenberg v. Aramark Educ. Servs., Inc., supra; Ex parte Dangerfield, 49 So.3d 675 (Ala.2010); Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003); Burgoon v. Alabama State Dep’t of Human Res., 835 So.2d 131, 132-33 (Ala.2002); Ex parte Mobile Cnty. Dep’t of Human Res., 815 So.2d 527 (Ala.2001); Ex parte Butts, supra; Ex parte Alabama Dep’t of Forensic Scis., 709 So.2d 455 (Ala.1997); Ex parte Franklin Cnty. Dep’t of Human Res., 674 So.2d 1277, 1279 (Ala.1996); and Alabama State Docks v. Saxon, 631 So.2d 943, 946 (Ala.1994). Accordingly, to the extent the sixth “exception” can be read as allowing “actions for ... damages [to be] brought against State officials in their representative capacity,” it is an incorrect statement of the law as it pertains to State immunity under § 14.
The sixth “exception,” as currently set forth in Harbert and other authorities, can *1141 also be read as allowing “actions for injunction ... [to be] brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law.” Harbert, 990 So.2d at 840. To the extent that the sixth “exception” as it is now formulated can be read as allowing actions for injunctive relief against State officials or agents in their individual capacity, it is an incorrect statement of the law because “a suit for injunc-tive relief against a State official in his or her individual capacity would be meaningless. This is so because State officials act for and represent the State only in their official capacities.” Ex parte Dickson, 46 So.3d 468, 474 (Ala.2010).
The sixth “exception,” as currently formulated, also allows “actions for damages [to be] brought against State officials ... individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law.” Harbert, 990 So.2d at 840. “This Court has recognized that a state officer or employee may not escape individual tort liability by ‘ “arguing that his mere status as a state official cloaks him with the state’s constitutional immunity.”’” Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989) (quoting Barnes v. Dale, 530 So.2d 770, 781 (Ala.1988), quoting in turn Tort Liability of State Officials in Alabama, 35 Ala. L.Rev. 153 (1984)). “Clearly, a state officer or employee is not protected by § 14 when he acts willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law.” Phillips, 555 So.2d at 83. However, actions against State officials or agents in their individual capacities are not without limits. “State officers and employees, in their official capacities and individually, also are absolutely immune from suit when the action is, in effect, one against the State.” Phillips, 555 So.2d at 83. In addition, as discussed in further detail below, a State official or agent may be entitled to State-agent immunity pursuant to Ex parte Cranman, 792 So.2d 392 (Ala.2000), as to actions asserted against him or her in his or her individual capacity.
Accordingly, based on the foregoing considerations, this Court today restates the sixth “exception” to the bar of State immunity under § 14 as follows:
(6)(a) actions for injunction brought against State officials in their representative capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, Wallace v. Board of Education of Montgomery County, 280 Ala. 635, 197 So.2d 428 (1967), and (b) actions for damages brought against State officials in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State. Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989).
The “exception” as restated in (6)(a) above is applicable to the circumstances presented here; Teplick has requested injunctive relief in the form of reinstatement to the position of chief of staff based on his assertion that the petitioners acted in bad faith, beyond their authority, or in mistaken interpretation of the law when they eliminated the position of chief of staff, resulting in the termination of his employment, without first providing him with the due process to which he claims he is entitled. As discussed above, Teplick was not entitled to any due process at the time the position of chief of staff was eliminated because he *1142 has failed to show that he had a property interest in the chief-of-staff position. Because Teplick was not entitled to any due process, we cannot conclude that the petitioners acted in bad faith, beyond their authority, or in a mistaken interpretation of law when they eliminated the chief-of-staff position without providing him with due process. Wallace, supra.
Accordingly, because we have concluded that Teplick’s claim for injunctive relief does not fall within one of the recognized “exceptions” to the bar of State immunity under § 14, the petitioners are entitled to a summary judgment as to Teplick’s claim for injunctive relief asserted against them in their official capacities.

B. Individual Claims

1. Due-Process Claim

Teplick’s due-process claim against the petitioners is based on the termination of his employment by USA as a result of the elimination of the chief-of-staff position without affording him certain due process to which he claims he was entitled. There can be no dispute that the petitioners were acting in their official capacities in deciding to eliminate the position of chief of staff based on financial and organizational concerns, which resulted in the termination of Teplick’s employment. Thus, any claims brought against the petitioners in their individual capacities seeking money damages are barred by State immunity under § 14 where the claim is in effect one against the State. Phillips, supra; Milton v. Espey, 356 So.2d 1201 (Ala.1978). “The prohibition of section 14 cannot be circumvented by suing the official or agent individually.” Milton, 356 So.2d at 1202. Further, as discussed above, the petitioners did not act in bad faith, beyond their authority, or in a mistaken interpretation of law in eliminating the chief-of-staff position so as to remove them from the protective cloak of State immunity and make them individually liable to Teplick. Phillips, supra. Also, to the extent Tep-lick seeks injunctive relief in the form of reinstatement to the chief-of-staff position from the petitioners in their individual capacities, that claim is meaningless because the petitioners can act on behalf of USA only in their official capacities and are without the necessary authority to provide the requested relief in their individual capacities. Ex parte Dickson, supra. Accordingly, we conclude that the petitioners are entitled to a summary judgment on the due-process claim asserted against them in their individual capacities.

2. Fraud Claim

Teplick asserted a fraud claim in count II of the complaint arising out of the alleged representation by Hammack that Teplick’s position as chief of staff was “secure.” Hammack argues that he is immune from suit as to Teplick’s fraud claim against him in his individual capacity pursuant to the doctrine of State-agent immunity set forth in Ex parte Cranman, supra. This Court in Cranman stated the test for State-agent immunity as follows:
“A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
“(1) formulating plans, policies, or designs; or
“(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“(a) making administrative adjudications;
“(b) allocating resources;
“(c) negotiating contracts;
“(d) hiring, firing, transferring, assigning, or supervising personnel; or
*1143 “(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
“(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
“Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
“(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.”
Cranman, 792 So.2d at 405.
Additionally:
“ ‘This Court has established a “burden-shifting” process when a party raises the defense of State-agent immunity.’ Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006). A State agent asserting State-agent immunity ‘bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity.’ 946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in Cranman is applicable. The exception being argued here is that ‘the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.’ 946 So.2d at 452. One of the ways in which a plaintiff can show that a State agent acted beyond his or her authority is by proffering evidence that the State agent failed ‘“to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.” ’ Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003) (quoting Ex parte Butts, 775 So.2d [173] at 178 [(Ala.2000)]).”
Ex parte Kennedy, 992 So.2d 1276, 1282-83 (Ala.2008).
It is clear that Hammack was engaged in a function that would entitle him to State-agent immunity pursuant to the second category of exception in Ex parte Cranman. Hammack was exercising his judgment in his administrative duties as to USA personnel when he allegedly made the statement upon which Teplick bases his fraud claim. Therefore, it was incumbent upon Teplick to demonstrate that one of the two exceptions to State-agent immunity recognized in Ex parte Cranman was applicable. Teplick argues that Hammack acted fraudulently in representing to him that his employment was secure and that, therefore, Hammack was not entitled to State-agent immunity under Ex parte Cranman. In this case, the alleged fraudulent conduct by Hammack made the basis of Teplick’s fraud claim is the same alleged fraudulent conduct that forms the basis of Teplick’s argument that Hammack’s conduct removed him from the protection of State-agent immunity.
*1144 Teplick argues that Hammack is precluded from claiming State-agent immunity under Ex parte Cranman because, he says, Hammack acted fraudulently in assuring him that his position as chief of staff was secure and then subsequently eliminating that position. Teplick contends that shortly after Kriesberg retired in the fall of 2004, he inquired of Ham-mack as to the status of the chief-of-staff position and Hammack informed him of his philosophical opposition to the chief-of-staff position but assured Teplick that his position was “secure” but that he “would not hire another Chief of Staff after [Tep-lick] left.” Although Teplick admits that these express words were not spoken to him, he states that, through Hammack’s “words, manner of speaking, and [the] context” of the conversation, he drew the inference that his position as chief of staff was secure until he chose to leave. Tep-lick contends that because of this assurance by Hammack, he continued his employment with USA as the chief of staff; he did not look for other employment at a time when he was younger and more employable; and he did not maintain certain clinical certifications that would have made him more employable.
The act alleged by Teplick to be fraudulent — Hammack’s assurance of Teplick’s future permanent employment as chief of staff and his subsequent elimination of that position — is in the nature of promissory fraud. See National Sec. Ins. Co. v. Donaldson, 664 So.2d 871 (Ala.1995). This Court discussed promissory fraud in Southland Bank v. A & A Drywall Supply Co., 21 So.3d 1196, 1210 (Ala.2008):
“ ‘A claim of promissory fraud is “one based upon a promise to act or not to act in the future.’” Ex parte Michelin North America, Inc., 795 So.2d 674, 678 (Ala.2001) (quoting Padgett v. Hughes, 535 So.2d 140, 142 (Ala.1988)).
“ ‘ “The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim ..., two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.” ’
“Michelin North America, 795 So.2d at 678-79 (quoting Padgett, 535 So.2d at 142).”
A heavier burden is placed upon a plaintiff in a promissory-fraud ease than in an ordinary fraud case. Heisz v. Galt Indus., Inc., 93 So.3d 918 (Ala.2012). “ ‘[A] reckless misrepresentation cannot constitute fraud where the alleged misrepresentation relates to some future event. Where the misrepresentation relates to some future event, it must be shown that the person making the representation intended not to do the act promised at the time the misrepresentation was made.’ ” Hillcrest Ctr., Inc. v. Rone, 711 So.2d 901, 906 (Ala.1997) (quoting Russellville Prod. Credit Ass’n v. Frost, 484 So.2d 1084, 1087 (Ala.1986)). The fact that the chief-of-staff position was eliminated approximately four years after Hammack allegedly assured Teplick that his position was secure is insufficient alone to establish a present intent on the part of Hammack to deceive or not to perform as promised when he allegedly made the statement. “ ‘[F]ailure to perform alone is not sufficient evidence to show a present intent not to perform.’ ” Heisz, 93 So.3d at 925 (quoting Gadsden Paper & Supply Co. v. Washburn, 554 So.2d 983, 987 (Ala.1989)).
Teplick points to the discussions between Hammack, Franks, and Strada re *1145 garding the elimination of the chief-of-staff position as evidence of Hammack’s intent, at the time Hammack allegedly represented to him that his position as chief of staff was “secure,” to deceive him and not to perform as promised. Teplick contends that as early as July 2007 Hammack was asking Franks and Strada to find ways to “absorb” the duties of the chief of staff and that he was not informed of the decision to eliminate the position until October 2008. Teplick’s argument in this regard implies that Hammack had decided to eliminate the chief-of-staff position before Ham-mack’s discussions with Franks and Strada and that his discussions with Franks and Strada were simply on how “to make it work.” This argument, which is not supported by the evidence, is flawed.
Hammack’s alleged representation to Teplick of “secure” employment occurred shortly after Kriesberg announced his retirement in the fall of 2004. However, the record indicates that the earliest any discussions began among Hammack, Franks, and Strada regarding the elimination of the chief-of-staff position was in July 2007, some two and one-half years after Ham-mack had allegedly represented to Teplick in the fall of 2004 that his employment was secure. Franks testified that these discussions among him, Hammack, and Strada concerned the organizational and financial considerations of eliminating the chief-of-staff position and that, despite Hammack’s philosophical opposition to the chief-of-staff position, Hammack had not decided to eliminate the position at the time these discussions began. Hammack testified that he did not make the decision to eliminate the chief-of-staff position until the fall of 2008.[7] Hammack informed Teplick in October 2008 that the position of chief of staff was being eliminated. Teplick was officially notified by letter in December 2008 that the chief-of-staff position would be eliminated as of March 31, 2009. Tep-lick continued in his employment as the chief of staff until that position was eliminated on March 31, 2009.
There is substantial evidence indicating that discussions among Hammack, Franks, and Strada regarding the elimination of the chief-of-staff position did not begin until July 2007 and that the decision to eliminate the position was not made by Hammack until the fall of 2008. Therefore, the discussions beginning in July 2007 do not evidence a present intent on Hammack’s part in the fall of 2004, when he allegedly represented to Teplick that his position was “secure,” to deceive Tep-lick or not to perform as promised by eliminating the chief-of-staff position. Southland Bank, supra.
Teplick also points to the removal by Hammack of several of his job duties and responsibilities as chief of staff shortly after Kriesberg retired as further evidence of Hammack’s present intent to deceive him and not to perform as promised at the time Hammack allegedly represented to him that his position as chief of staff was “secure.” Hammack admitted that he was opposed to the chief-of-staff position based on organizational and managerial consider *1146 ations and that he had informed Teplick of that fact. Although Hammack removed some of Teplick’s duties and responsibilities shortly after Kriesberg retired and Teplick began reporting to Hammack, it was not until July 2007 that Hammack first began discussing with Franks and Strada the feasibility of eliminating the chief-of-staff position. The removal of some of Teplick’s duties and responsibilities by Hammack shortly after Teplick began reporting to him was wholly consistent with Hammack’s duties as the hospital administrator and his known philosophical objections to the position of chief of staff. Hammack explained that some of Teplick’s responsibilities and duties were reassigned at that time for the purpose of creating “broader representation, perspective and accountability” because Teplick, as the chief of staff, had no one reporting directly to him. Further, Teplick continued to serve as the chief of staff for approximately four years after Hammack removed some of his duties and responsibilities; the position was eliminated in the fall of 2008. Accordingly, we cannot conclude that Hammack’s removal of some of Teplick’s job duties and responsibilities shortly after Teplick began reporting to him evidences an intent on the part of Hammack to deceive Teplick, or not to perform as promised, when he allegedly represented to Teplick that his position was “secure.” Southland Bank, supra.
Based on the foregoing, we conclude that Teplick has failed to present substantial evidence creating a question of fact as to whether Hammack acted fraudulently in eliminating the chief-of-staff position so as to remove Hammack from the umbrella of protection afforded by the doctrine of State-agent immunity. Teplick failed to present substantial evidence indicating that Hammack had a present intent to deceive him and not to perform as promised at the time he allegedly assured Tep-lick that his position as chief of staff was “secure.” We note further that Teplick acknowledged in his deposition that he is not claiming that anyone lied to him and admitted that he has no proof that anyone stated something to him they knew to be untrue. See Southland Bank, supra, (holding that misrepresentations made recklessly or innocently will not sustain an action alleging promissory fraud); and Segrest v. Lewis, 907 So.2d 452 (Ala.Civ.App.2005) (holding that innocent misrepresentations do not fall within the exception to State-agent immunity applicable when State agents act willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law). Accordingly, because Teplick has failed to establish by substantial evidence that Hammack intentionally misled or deceived him at the time Ham-mack allegedly assured him his position was “secure,” Hammack is entitled to State-agent immunity as to the fraud claim asserted against him in his individual capacity.

S. “Malice” Claim

Teplick asserted in count III of the complaint a claim of “malice”[8] against Strada, alleging that Strada intentionally withheld an appointment as an adjunct professor from him, resulting in Teplick’s being damaged. Strada was entitled to State-agent immunity with regard to any action he took in appointing or not appointing Tep-lick to a position as adjunct professor. Therefore, the burden shifted to Teplick to demonstrate that Strada acted willfully, maliciously, fraudulently, in bad faith, be *1147 yond his authority, or under a mistaken interpretation of the law in withholding the appointment as adjunct professor from Teplick. Ex parte Kennedy, supra. Teplick failed to present any argument or evidence in opposition to Strada’s motion for a summary judgment as to the “malice” claim based on Strada’s contention that he was entitled to State-agent immunity.[9] Accordingly, to the extent that Teplick has alleged a cognizable claim against Strada in his individual capacity, Strada was entitled to State-agent immunity as to that claim.

Conclusion

The petitioners have demonstrated a clear legal right to the relief they have requested. Accordingly, we grant the petition for a writ of mandamus and direct the trial court to enter a summary judgment in favor of the petitioners on all claims asserted against them in both their official and individual capacities based on the doctrines of State immunity and State-agent immunity.
PETITION GRANTED; WRIT ISSUED.
PARKER, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
MURDOCK, J., dissents.

. Hammack reported to Kriesberg.

. Hammack testified that Teplick’s salary, including benefits, was approximately $400,000 annually.

. The "Memorandfa] of Reappointment" from 2001 through 2004 actually refer to Teplick as being a "clinical professor”; however, Strada explained that "clinical professor" was the term formerly used by USA to describe "adjunct professor.”

. Teplick originally sued USA, but, in response to a motion to dismiss, he amended his complaint to assert claims only against the petitioners.

. Although Teplick claims that he was entitled to a due-process hearing upon the elimination of his position at USA, nothing in the record before us indicates that Teplick actually requested a due-process hearing. An employee bears the responsibility for actually requesting a due-process hearing. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Christeson v. Northwest Alabama State Jr. Coll., 371 So.2d 426 (Ala.Civ.App.1979).

. See Duffy v. Sarault, 892 F.2d 139 (1st Cir.1989) (noting that, where reorganization or cost-saving measures result in the termination of a public employee's employment as the result of the elimination of the employee's position, no hearing is required to satisfy due process).

. Strada also testified that the discussions with Hammack centered on the organizational and financial aspects of the chief-of-staff position. However, when asked if Hammack had already decided to eliminate the position when the discussions began, Strada replied “I think so.” Given the testimony of Hammack and Franks, however, this testimony by Stra-da does not constitute substantial evidence of a lack of present intent on the part of Ham-mack not to perform as promised in the fall of 2004. See West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989) (defining "substantial evidence” as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved”).

. There is no cause of action in this State for ‘'malice.” The term "malice” is generally recognized as a measurable degree of conduct typically used to assess damages. See § 6-11-20, Ala.Code 1975.

. Teplick has not raised an argument relative to the "malice” count in his brief in response to the petition for the writ of mandamus. Thus, to the extent that Teplick has asserted a claim of "malice," he has abandoned that claim. See Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So.2d 317, 319 (Ala.2003).