BOLIN, Justice.
John R. Cooper, in his official capacity as director of the Alabama Department of Transportation (“ALDOT”), appeals from the Montgomery Circuit Court’s December 16, 2014, order enjoining him from prohibiting Eddie Ziegler, Lisa Ziegler Player, Jennifer Ziegler Cousins, Angela Gay Ziegler Bracknell, and Cathy Donaldson (hereinafter sometimes referred to collectively as “the Zieglers”)* from obtaining legal permits to build seven to eight houses on the Zieglers’ property or from otherwise interfering with the Zieglers’ plans and likewise enjoining Cooper from withholding consent for the building of those houses in the event the .Zieglers obtain the required permits. Because we find that Cooper is entitled to sovereign immunity, we reverse and remand..

I. Facts and Procedural History

This appeal involves real property located in Montgomery County on what is referred to by the parties as the Interstate 65 Peninsula (“the peninsula”), which runs underneath and alongside a portion of Interstate 65; the peninsula lies in the> floodplain of the Alabama River, In 1971, AL-DOT condemned approximately 290 acres of the peninsula for the construction of a portion of the Interstate 65- structure — the roadway, 10 relief bridges, and the Alabama River Bridge. The condemnation order, which was entered by the Montgomery County Probate Court on February 2, 1971, also included a protective easement, perpetual in nature, in favor of ALDOT on approximately 1,700 acres of the peninsula, the purpose of which was to protect the Interstate 65 structure from future flood-damage risks. According to the record, the Interstate 65 structure was strategically placed on the peninsula based bn the records from a flood in 1961; the last major flood was in 1990. There are 15 tracts, of property over which the Interstate 65 structure crosses that are encumbered by the easement. The Zieglers and their predecessors in title have owned, .for over 60 years, one of those tracts of property, which consists of approximately 480 *724 acres. Pursuant to the 1971 condemnation order, the Zieglers’ predecessors in title were compensated by ALDOT for the easement over their property. Section I of the easement describes specific activities that ALDOT has the right to 'prohibit where deemed necessary to protect the integrity of the Interstate 65 structure; section II lists the purposes for the easement; and section III describes those rights that are expressly reserved in the landowners, including the right of immediate reverter in the event a specific flood-control project comes into existence that would render the rights and easements unnecessary for the protection of the Interstate 65 structure. The easement reads as follows:
“I. A PERPETUAL AND ASSIGNABLE EASEMENT in, over, upon and across the property hereinafter described for the establishment and use as a restricted area in, on, over and across Tract No. 8 of Project No. 1-65-1(49), Montgomery County, Alabama, which property is further described more particularly hereinafter, consisting of the right to prohibit where deemed necessary by [ALDOT] to protect said interstate highway in, on, over, upon, under and across said property:
“(1) The filling, excavation and!or removal of soil, including sand and gravel, or minerals which may exist on or below the surface of the ground, except minerals such as oil or gas which may be removed by drilling. Exploratory investigation is prohibited except upon written permission of [ALDOT].
“(2) Any act or use of the land that would result in the destruction and/or removal of trees, foliage and plants of natural growth except upon the written permission of [ALDOT], and except as hereinafter provided, and also:
“The right to prohibit in, on, over, upon, under and across said property:
“(3) The erection of billboards, signs or any form of commercial advertising.
“(4) The establishment of junkyards as defined in Title 23, Sec. 64(7), Code of Alabama, or the dumping of trash, rubbish, garbage, junk, offal, and unsightly or offensive materials in the area except by written permission of [ALDOT].
“II. A perpetual and assignable easement in, over and across the property hereinafter described for the following purposes:
“The right to post signs indicating the nature and extent of [ALDOT’s] control; the reasonable right of ingress over and across said lands for the purpose of exercising the rights set forth herein: the right to plant, locate, move or remove, destroy or relocate any and all trees, foliage or plants of natural growth or nursery stock wherever located to any location, necessary for the preservation and protection of the highway designated as Interstate Highway 65, except as hereinafter provided, the right to place stones, rocks, rip rap, or other material providing slope protection or any other protection necessary for the preservation and protection of a highway designated as Interstate Highway 65.
“HI. The rights herein acquired by [ALDOT] are subject and conditioned to the following rights and interests which are expressly reserved in the landowners, their heirs, successors and assigns:
“(1) It is expressly reserved to the landowners herein, their heirs and assigns, the right to use for agricultural and farming purposes, including pasture and crop cultivation, all areas tvhich are shown as open land, and so designated on the attached maps which are filed herewith and made a part of these proceedings.
*725 “(2) It is expressly reserved to the landowners, their heirs and assigns, the right to continue to use, to replace at their present location and to maintain at their present location all structures which are now in place.
“(3) It is expressly reserved to the landowners herein, their heirs and assigns, all such rights and privileges as may be used without interfering or abridging the rights and easements hereby acquired by [ALDOT],
“(4) The right of immediate reverter of all rights and interests being acquired (except those acquired in Paragraph 1(3) and (4) above, should flood control projects of such nature and magnitude be constructed as to render the rights and easements herein acquired unnecessary for the protection of the highway right-of-way knoivn as Interstate Highway 65 and all improvements thereon, from those minor and major floods such as might occur in the future.”
(Emphasis added.)
The Zieglers are desirous of building on their property seven to eight family houses constructed on pilings,, and they requested Cooper’s written permission in order to do so. Cooper, however, denied their requests because building houses on the peninsula would require, among other things, digging, cutting trees, and removing soil— activities that, according to the easement, Cooper has the right to prohibit when deemed necessary to protect the Interstate 65 structure from future flood risks.
On June 19, 2014, the Zieglers sued Cooper in his official capacity as director
of ALDOT. The Zieglers asserted in count I of their complaint an inverse-condemnation claim pursuant to § 18-1A-32(a), Ala.Code 1975. They specifically alleged in count 1(1) that the Montgomery County Probate Court had entered a condemnation order in 1971, granting AL-DOT’s request for a protective easement over their property; (2) that it was never the intent of the condemnation order to give ALDOT complete dominance over the entire 480 acres; and (3) that the taking of the entirety of the Zieglers’ real property for public use without formal condemnation proceedings and without just compensation by ALDOT constituted inverse condemnation. The Zieglers asserted in count II of their complaint a claim for both declaratory and injunctive relief. Specifically, they sought to enjoin Cooper from interfering with or prohibiting their building on the peninsula based on allegations that Cooper had acted fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of law in denying their requests to build on their property. They further requested that the circuit court enter a judgment declaring that the Zieglers owned all rights to their entire property, subject to a reasonable easement for ingress and egress in ALDOT.
On August 1, 2014, Cooper filed, pursuant to Rule 12(b)(1), Ala. R. Civ. P., a motion to dismiss the Zieglers’ complaint on theories of sovereign immunity, collateral estoppel, and res judicata. The circuit court held a hearing and denied Cooper’s motion on December 4,2014.[1]
*726 On December 10, 2014, the circuit court conducted a bench trial. .At the close of all the evidence, Cooper moved for a judgment as a matter of law on the ground of ’sovereign immunity, which the circuit court denied. On December 16, 2014,' the circuit court entered an order finding that the Zieglers had demonstrated the right to injunctiye relief.[2] Specifically, the circuit court found:
“(1) The parties stipulated as to the admissibility of the Protective Easement (here[in]after referred to as ‘Easement’) governing the [Zieglers’] property. According to the Easement, the right to reasonable use of the [Zieglers’] property was vested and remained in the [Zie-glers] (as successors in title),, even though [ALDÓT] acquired an easement on the property that is the subject of the [Zieglers’] complaint.
“(2) Professional engineer [David] Reed of Goodwyn, Mills and Cawood testified that there is no evidence that the building of honres on the [Zieglers’] property on the Alabama River ivould have a negative impact on the 1-65 bridge.
“(3) [ALDOT] presented no evidence to refute the testimony of Reed, or any other evidence that the building of 7 or 8 homes on the [Zieglers’] property would have a direct, negative impact on the 1-65 bridge through flood 'or erosion.
[[Image here]]
“(6) [The Zieglers] have demonstrated the right to injunctive relief in this casé and the Court orders as follows:
“[1.] The defendant John Cooper and all of his representatives, employees, agents, successors and assigns are hereby enjoined from interfering with or prohibiting the [Zieglers] from obtaining legal permits from the relevant permitting authorities that are legally required for the building of 7-8 homes on the [Zieglers’] property. The foregoing are also enjoined from withholding consent for the building of these homes if the [Zieglers] are able to obtain the necessary permits'from the relevant permitting authorities for building these homes.
“2. The [Zieglers] will be restricted to cutting, only a few trees that would be necessary to construct these homes.” .
(Emphasis added.) Cooper appeals.
II. Standard of Remew and , Applicable Law
In Collins v. Rodgers, 938 So.2d 379, 384 (Ala.2006), this Court stated:
“The trial court entered a permanent injunction, and we review de novo the entry of a permanent injunction. TFT, Inc. v. Warning Sys., Inc., 751 So.2d 1238, 1241 (Ala.1999). However, the trial court also conducted a bench trial at which evidence was presented ore tenus.
“ ‘Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as' to the court’s conclusions on issues of fact; its determination will not be disturbed unless it is clearly erroneous, without supporting • evidence, manifestly unjust, or against the great weight of the evidence. However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.’
*727 “American Petroleum Equip. & Constr., Inc. v. Fancher, 708 So.2d 129, 132 (Ala. 1997) (citations omitted).”

III. Discussion

As previously indicated, the Zie-glers sued Cooper in his official capacity as director of ALDOT; the Zieglers did not sue ALDOT. Cooper argues on appeal that the Zieglers’ claim for injunctive relief against him in his official capacity is barred by Art. I, § 14, Ala. Const.1901, because, he says, the claim is, in actuality, a claim against ALDOT, the result of which has stripped ALDOT of its property rights in the protective easement. Cooper further asserts that the circuit court was without jurisdiction to grant the Zieglers’ request for injunctive relief because, he says, the Zieglers failed to demonstrate that Cooper acted fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law in denying their requests to build houses on their property. Specifically, Cooper asserts that he had a duty under the protective easement to maintain and protect the Interstate 65 structure, that he denied the Zieglers’ requests to build* houses on their property because to do so involved activities that are expressly' prohibited by the protective easement, and that he had the authority to enforce the protective easement as a conduit of his duty to maintain the Interstate 65 structure. We agree.
Section 14 states: “[T]he State of Alabama shall never 'be made a defendant in any court of law or equity.” It is undisputed that ALDOT is a State agency and, as such, is immune from suit pursuant to § 14. See Ex parte Alabama Dep’t of Transp., 764 So.2d 1263, 1268 (Ala.2000) (“ALDOT is clearly, a State agency, and, as such, is immune from suit.”). -Although the Zieglers did not sue ALDOT, it is well settled that “State officers and employees, in their official capacities and individually, are absolutely immune from' suit when the action is, in effect, one against the State.” Mitchell v. Davis, 598 So.2d 801, 806 (Ala. 1992). In Alabama Department of Transportation v. Harbert 'International, Inc., 990 So.2d 831, 839-40 (Ala.2008) (abrogated in part on other grounds by Ex parte Moulton, 116 So.3d 1119, 1141 (Ala. 2013)), this Court stated the following well established law1 regarding sovereign or State immunity:
“Section 14 provides generally that the State of Alabama is immune from suit: ‘[T]he State of Alabama shall never be made a defendant in any court of law or equity.’ , This constitutional provision ‘has been described as a “nearly impregnable” and “almost invincible” “wall” that provides the State, an unwaivable, absolute immunity from suit, in any court.’ Ex parte Town of Lowndesboro, 950 So.2d 1203, 1206 (Ala.2006). Section 14 ‘specifically prohibits the State from being made a party defendant in any suit at law or in equity.’ Hutchinson v. Board of Trs. of Univ. of Alabama, 288 Ala. 20, 23, 256 So.2d 281, 283 (1971). Additionally, under §' 14, State agencies are ‘absolutely immune from suit.’ Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003).
“Not only is the. State immune from suit under § 14, but ‘[t]he State cannot be sued indirectly by suing an officer in his or her official capacity....’ Lyons, 858 So.2d at 261. ‘Section 14 prohibits -actions against state officers in-.their official capacities when those actions are, in effect, actions against the State.’ Haley v. Barbour County, 885 So.2d 783, 788 (Ala.2004). To determine whether ■an action against a State officer is, in fact,-one against the State, this- Court considers *728 ‘“whether “a result favorable to the plaintiff would directly affect a contract or property right of the State,” Mitchell [v. Davis, 598 So.2d 801, 806 (Ala.1992) ], whether the defendant is simply a “conduit” through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So.2d 770, 784 (Ala.1988), and whether “a judgment against the officer would directly affect the financial status of the State treasury,” Lyons [v. River Road Constr., Inc.], 858 So.2d [257] at 261 [ (Ala.2003) ].’
“Haley, 885 So.2d at 788. Additionally, ‘[i]n determining whether an action against a state officer is barred by § 14, the' Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought.’ Ex parte Carter, 395 So.2d 65, 67-68 (Ala. 1980).
[[Image here]]
“Moreover, certain causes of action are not barred by § 14:
“‘“There are four general categories of actions which in Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1971), we stated do not come within the prohibition of § 14: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; and (4) actions brought under the Declaratory Judgments Act ... seeking construction of a statute and its application in a given situation. 287 Ala. at 229-230, 250 So,2d 677. Other actions which are not prohibited by § 14 are: (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law. Wallace v. Board of Education of Montgomery County, 280 Ala. [635] at 639, 197 So.2d 428 [ (1967) ]; Unzicker v. State, 346 So.2d 931, 933 (Ala.1977); Engelhardt v. Jenkins, 273 Ala. 352, 141 So.2d 193 (1962).” ’
“Drummond Co. v. Alabama Dept of Transp., 937 So.2d 56, 58 (Ala.2006) (quoting Carter, 395 So.2d at 68) (emphasis omitted). These actions are sometimes referred to as ‘exceptions’ to § 14; however, in actuality these actions are simply not considered to be actions ‘ “against the State” for § 14 purposes.’ Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002). This Court has qualified those ‘exceptions,’ noting that ‘“[a]n action is one against the [S]tate •when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiffs recovery of money from the [S]tate.” ’ Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala. 2004) (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ. App.1995))....”
(Emphasis omitted.) Later, in Ex parte Moulton, 116 So.3d 1119 (Ala.2013), this Court restated the sixth “exception” to the sovereign-immunity bar under § 14 as follows:
“(6)(a) actions for injunction brought against State officials in their representative capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, and (b) actions for damages brought against State officials *729 in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State.”
116 So.3d at 1141 (citations omitted).
The Zieglers asserted in their complaint a claim for injunctive relief against Cooper in his official capacity as director of AL-DOT based on allegations that Cooper acted fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of law in denying their requests to build houses on their property. Clearly, this allegation, if proven, would remove Cooper from the protection of § 14 immunity, and the Zieglers would be entitled to injunctive relief. Moulton, supra. Cooper, however, maintains that his actions in denying the Zieglers’ requests to build houses on their property were strictly in accordance with ALDOT’s purchased rights in the easement and were not done fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. Specifically, Cooper maintains that he denied the Zieglers’ requests to build houses on their property because, he says, the construction would require digging, cutting trees, and removing soil and, additionally, cars, boats, and other structures that tend to accompany waterfront houses could compromise the Interstate 65 structure and the integrity of the peninsula in flooding conditions by speeding up the erosion, of the peninsula and causing possible bridge failure. Accordingly, the case proceeded to trial for the Zieglers to demonstrate that Cooper acted fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of law in denying their requests to build houses on their property located on the peninsula.
The Zieglers relied on the testimony of David Reed, a professional engineer with the engineering firm Goodwyn, Mills and Cawood, who opined that the building of seven to eight houses on the Ziegler property would have no significant effect on the Interstate 65 structure. Reed submitted a letter that states:
“Per your request, I have been asked to give my opinion on the effects to the Interstate system that would result as a consequence of the removal of some trees and. the construction of several homes on approximately 1,200 [linear feet] of the east river bank of the Alabama River on a 9-acre lot in Section 27 Township 17N, Range 17E, Montgomery County, Alabama. This review of the property, flood maps and subsequent opinion is based only on my engineering judgment and experience. There have been no hydrological studies commissioned or authorized by the property owner.

H

“Considering all of the data recorded above and the exact effects that removing a few trees and building homes on pilings is obviously not a task that could be easily done. The proof or disproof of scour damage or erosion caused by an incremental increase [in] flow velocities at any one of the 10 relief bridges on 1-65 falls outside the exactness of the science. It is well known that hydrology of large, complex, river systems is an inexact science. More, it is a tool to be used, along with the historical and empirical data, to predict generalized behavior of a river basin in various conditions of weather, i.e., flood or drought.

“Using only logic, as I have had no specific hydrological studies done on the issue of increased velocity at a specific point(s), in a specific event, caiused by a specific set of circumstances, I don’t be-
*730
Heve there could be any significant effect caused by the issue at hcmd. ....

[[Image here]]
“In conclusion, I will state that my opinions are just that. I have performed no engineering studies. I have relied on ' niy own expertise and knowledge, aided by reports and publications from PEMA and the U.S.G.S.[3 ] It seems logical to conclude that even a very detailed study will not have the capability to discern ‘tiny nuances in flow velocities or direction of a major river flood based on what I have observed. The construction of houses in this area will' require that they be built on pilings and have a lowest finished floor a foot above the 100 Year Flood elevation. The county will require that a No Rise Certification be filed on each house. The No Rise Certification will certify that the construction will not cause a 1-foot or more rise in the Base Flood Elevation. The No Rise Certification is reviewed and approved by the County Flood Administrator.”
(Emphasis added.) At trial, Reed reiterated:
“And in just determining whether you could determine what would be the hy-drologic effects of removing trees and building a house on piers, it was just my point and the tvhole letter was to show that it would be nearly impossible to accurately describe what would happen, whether it would haye any effect at all. My suspicion is that it would have no effect:’
(Emphasis added.)
Cooper, in turn, relied on the testimony of John Curry, an engineer specializing in hydraulics ■ and hydrology, who formerly worked with ALDOT in its bridge-scour department, Curry stated that he had performed a lot of work on the peninsula and that he had in fact published a paper on the peninsula. Curry explained in more detail the purpose of the easement and the probable effects of developing the peninsula:[4]
“Q. All right. The protective easement that we’re talking about here, what does the protective easement do if, in fact, [ALDOT] maintains it, maintains all their rights — by that, I mean not letting people build new houses, not letting them dig gravel,- not letting them cut a bunch of trees — what is the purpose of all-that?
“A. So really, it’s to try and keep [the peninsula] the same as it was during [the original] design and construction. So'what we have is — this is one of the most complex hydraulic sites in the [United States]. I mean ..., you have different flows that are -occurring out through here you’ll have .different impacts- if you have obstructions put out in your floodplain.- But the idea is, keep it as close to what it was ... as can be naturally possible you know. So — and that way, you have some protection.
“Q. Okay, so what can happen if you change the natural setting ... when it was designed. What are some of the things that can happen?
“A. Well, you can have increased velocities. Increased velocities can cause accelerated erosion. So you have faster movement of that meandering part of the stream.- You know, another thing that you can have that’s more ... of a concern up 'in this area where we’re talking about today is, you know, if you *731 put source loadings up there — source loadings being if you have vehicles or if you have buildings, whatever is in there that can possibly fail due to debris building up on it and, you know, the water is very strong and, if it pushed it over or if there was high winds or just-floated the ears down into the ... relief bridges —
[[Image here]]
“A. Cars can get caught up if they get in the flow of the debris in' general and anything can. If it gets-hung up on the pier, it causes scour. And that’s — 60 percent of all bridges that fail [are] due to scour.
“Q. 'What is scour?
“A. Scour is erosion of your foundations. And ... it’s a very important aspect of bridge inspection that has to be accounted for.
[[Image here]]
“Q. And you just testified that you wrote a paper about this particular spot in the river. What is your opinion as to [ALDOT] not enforcing its protective rights under’ this easement? Is there any consequence to that?
“A. I absolutely think there is. So you’ve got direct and indirect consequences. Of course, the indirect is the easy one. It’s ... everybody else who’s come in the past [who have sought permission to build on the peninsula and have been denied], seems like that’s going to be a real issue.... The direct consequences would be we’ve got a river that’s 1,000 feet wide by 50 feet deep that is headed towards the interstate. ...
“Putting anything that can be an object of debris within the floodplain upstream would be a direct impact during a flood that could come down and get caught up on some piers.
[[Image here]]
“Q. So • there’s a natural occurrence — if my understanding is right, there’s a natural occurrence'that’s going on with erosion out there today.
“A. Yes.
“Q. And -it’s going towards the interstate?
“A, Yes.,,
“Q. Are you saying 'that to develop this peninsula with structures, ■ cut the trees, dig gravel pits, et cetera, would that exacerbate the situation ?
“A. Oh, yeah, it absolutely could. And depending on where you’re at, its going to have more of an impact.

it

“Q. Does it change the effect the river water has on the bridge if you add structures or cut trees and does it change the scour effect on the bridge piers themselves ?
“A". It can. It can. I mean, depending oh the degree of what you’re doing, it absolutely can.”
(Emphasis added.) In other words, Curry testified that the Alabama River, .presumably on which the peninsula lies, is one of the most complex hydraulic sites in the United States;, that the purpose of prohibiting persons from developing the peninsula was to keep the peninsula the same as it was during the original design and construction of the Interstate 65 structure; and that .there could be.both direct and indirect consequences should ALDOT be unable to exercise its protective rights under the easement. . .
Based on the evidence presented, the circuit court had a duty to dismiss the Zieglers’ claim for injunctive relief insofar as the Zieglers failed to demonstrate that Cooper acted fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of law in denying their re *732 quests to build houses on their property; beyond such a showing, the Zieglers failed to meet the requirements for in-junctive relief so as to bypass § 14 immunity. Moulton, supra. Rather, the circuit court took the case under submission and ultimately found that the Zieglers were entitled to injunctive relief because, the circuit court reasoned, Cooper “presented no evidence to refute the testimony of Reed, or any other evidence that the building of 7 or 8 homes on the [Zie-glers’] property would have a direct, negative impact on the 1-65 [structure] through flood or erosion.” In fashioning its injunctive relief, the circuit court seemingly ignored both the stated purpose of the protective easement, which is to protect and preserve the Interstate 65 structure from future flood risks, and the fact the easement speaks for itself insofar as it expressly provides that Cooper has the “right to prohibit” the “filling, excavation and/or removal of soil, including sand and gravel, or minerals,” and “[a]ny act or use of the land that would result in the destruction and/or removal of trees, foliage and plants of natural growth except upon the written permission of [AL-DOT].” The Zieglers’ predecessors in title were compensated by ALDOT for the easement over their property and the easement will cease to exist only
“should flood control projects of such nature and magnitude be constructed as to' render the rights and easements herein acquired unnecessary for the protection of the highway right-of-way known as Interstate Highway 65 and all improvements thereon, from those minor and major floods such as might occur in the future.”
The testimony at trial was that, to date, there are no reasonable flood-control measures in place to prevent the peninsula from flooding. Moreover, section III of the easement states only two rights that are clearly reserved in the Zieglers: the right to use their property for “agricultural and farming purposes” (III(l)) and the right “to continue to use, to replace at their present location and to maintain at their present location all structures which are now in place” (111(2)). The easement does not expressly reserve in the Zieglers the right to build any new structures on their property beyond what was there at the time ALDOT acquired its easement. Section 111(3) states that it is expressly “reserved to the [Zieglers] ... all such rights and privileges as may be used without interfering or abridging the rights and easements hereby acquired by [ALDOT].” In other words, the Zieglers may exercise their reserved rights under the easement only if doing so would not interfere with or abridge ALDOT’s rights in its protective easement. See, e.g., Alabama Power Co. v. Drummond, 559 So.2d 158, 161 (Ala. 1990) (“It is also well recognized that Alabama law requires the owner of a servient tenement to refrain from doing any act that would interfere with or be inconsistent with the proper right to use and enjoy the easement vested in the owner of the dominant tenement.”).
To reiterate, an action against a State official in his or her official capacity seeking injunctive relief based on allegations that the State official acted fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of law is not considered to be an action against the State for § 14 purposes. Harbert, supra. In this case, however, the record is devoid of any evidence indicating that Cooper, acting in his official capacity as director of ALDOT, acted beyond the scope of his authority or otherwise in exercising his express rights under the easement to protect the integrity of the Interstate 65 structure; the circuit court made no such finding, and the Zieglers fail to *733 point to any testimony in the record that supports such a finding. In essence, the Zieglers’ claim for injunctive relief, although purportedly asserted against Cooper in his official capacity, is in actuality an indirect claim against ALDOT insofar as the claim impermissibly strips ALDOT of its property rights under the easement to protect and preserve the integrity of the Interstate 65 structure. Accordingly, the Zieglers’ claim for injunctive relief against Cooper in his official capacity is due to be dismissed on the ground of sovereign immunity.

IV Conclusion

Cooper established that he was entitled to sovereign immunity. . Accordingly, the circuit court is directed to dismiss the action against Cooper and to vacate its order granting the Zieglers’ requested in-junctive relief. “If, ‘at any stage of the proceedings,’ the trial court, or this Court, ‘becomes convinced that [the action] is a suit against the State and contrary to Sec. 14 of the Constitution,’ it must dismiss the action.’ Patterson v. Gladwin Corp., 835 So.2d 137, 154 (Ala.2002) (quoting Aland v. Graham, 287 Ala. 226, 229, 250 So.2d 677, 678 (1971)).
REVERSED AND REMANDED WITH INSTRUCTIONS.
MURDOCK and MAIN, JJ., concur.
MOORE, C.J., and BRYAN, J., concur in the result.

. Cooper petitioned this Court for emergency mandamus relief, asserting that he was entitled to sovereign immunity pursuant to Art. I, § 14, Ala. Const.1901. This Court, by order, denied Cooper’s petition because it appeared from the allegations in the complaint, as well as other materials before the circuit court, that the Zieglers had stated a valid inverse-condemnation claim or at least had presented issues of fact regarding the same. Ex parte Cooper (No. 1140241, Dec. 9, 2014), — So.3d - (Ala.2014) (table). See Graveman v. Wind Drift Owners’ Ass’n, 607 So.2d 199 (Ala. 1992) (noting that conversion of a motion to dismiss to a motion for summary judgment is proper where the parties file matters outside *726 the pleadings and those matters are not excluded by the trial court).

, Apparently the Zieglers abandoned their inverse-condemnation claim and their claim . seeking declaratory relief before this case was tried.

. Federal Emergency Management Agency and United States Geological Survey, respectively.

. As previously indicated, there are 15 tracts . of property affected by the easement. The ' Zieglers' tract encompasses approximately 480 acres of the peninsula..